521 P.2d 617

**The STATE of Arizona, Appellee and Cross-Appellant,**

v.

**Carl Anthony PETRALIA, Jr., Appellant and Cross-Appellee.**

**No. 2609.**

Supreme Court of Arizona,
In Banc.

April 18, 1974.

Rehearing Denied May 21, 1974.

Gary K. Nelson, Atty. Gen., by Grove M. Callison and R. Wayne Ford, Asst. Attys. Gen., Phoenix, for appellee and cross-appellant.

Cavness & DeRose and John W. Rood, Phoenix, for appellant and cross-appellee.

CAMERON, Vice Chief Justice.

This is an appeal by the defendant, Carl Anthony Petralia, Jr., from a judgment of guilt to the crime of possession of a dangerous drug for sale, §§ 32–1970(C), 32–1996(C), and 32–1901 A.R.S., and a cross-appeal by the State from the sentence of not less than one year nor more than life imprisonment in the Arizona State Prison.

The defendant presents the following issues on this appeal:

1. Was the State's evidence obtained as the result of an illegal wiretap?
2. Was it error for the court to allow the State to present evidence concerning a prior sale of dangerous drugs by the defendant?
3. Was the package of dangerous drugs obtained as a result of the prior sale improperly admitted in evidence?
4. Did the defendant establish entrapment as a matter of law?

The State, pursuant to § 13–1712 A.R.S., appeals on a single ground, asking that we either reinstate the original sentence imposed by the court (25 years to life imprisonment), but later vacated for resentencing in accordance with State v. Hays, 109 Ariz. 123, 506 P.2d 254 (1973), which has since been overruled by this court in State v. Lewis, 109 Ariz. 466, 512 P.2d 9 (1973), or, in the alternative, that we remand for resentencing.

The facts necessary for a determination of these matters on appeal are as follows. In the early part of the year 1972 the defendant, Carl Anthony Petralia, Jr., was the subject of independent investigations by both the Police Department of the City of Phoenix, Arizona, and the Arizona Department of Public Safety. On 21 April 1972 the Phoenix police obtained a wiretap order pursuant to former § 13–1057 A.R.S. (repealed by § 1, Ch. 149, Laws of 1972), authorizing a tap on the defendant's phone for the period of 21 April 1972 through 11 May 1972.

On 26 May 1972 one Darla Merrill contacted Detective Koelsch of the Depart-

ment of Public Safety to arrange a meeting in Tempe between Detective Koelsch and her boyfriend, John Michael Vigerito. She indicated that Vigerito might be able to aid the Department of Public Safety in its investigation of the defendant. At their meeting Vigerito told Koelsch that he had previously obtained methamphetamine from Petralia, and that he would be willing to help the Department of Public Safety in exchange for dismissal of criminal charges which were pending against him and Darla Merrill. Apparently, either at that meeting or sometime thereafter, Vigerito requested and was given $1000 as an additional incentive.

On 29 May 1972 Detective Koelsch contacted Patrolman Lash of the Phoenix Police Department to discuss the possibility that the city police would recommend dismissing the charges against Vigerito and Merrill. Lash had been involved in the wiretap of the defendant's phone and was also partly responsible for the charges pending against Vigerito and Merrill. Patrolman Lash stated at that time that he had no objection to the dismissal of the charges, and he also expressed his opinion that Vigerito could most likely be of assistance to the Department of Public Safety.

On 31 May 1972, working in concert with the Department of Public Safety, Vigerito went to Petralia's apartment to arrange to buy some methamphetamine. On 3 June 1972 a supervised sale took place, whereby the Department of Public Safety gave Vigerito $900 in recorded bills and an automobile which was owned by the Department and had been searched and found to be clean of any narcotics. Under the surveillance of the law enforcement officers Vigerito met Petralia in the parking lot of Hobo Joe's Restaurant where he received approximately four ounces of methamphetamine in exchange for the $900. Petralia was not arrested at that time nor was he ever charged with possession or sale relating to the incident on 3 June.

Another supervised sale was arranged for 5 June 1972. This time Vegerito was given $2500, again in prerecorded bills, with which to purchase ½ pound of methamphetamine. Vigerito gave the defendant the $2500 and it was agreed that Vigerito would receive the drugs in the parking lot of the Nantucket Lobster Trap Restaurant. Officers observed the defendant hand Vigerito a brown paper bag which was seized and later determined to contain approximately ½ pound of methamphetamine. Laboratory tests on the bag also revealed the defendant's fingerprints. Petralia was immediately arrested, but a search for the prerecorded currency proved futile. The officers thereafter secured a search warrant for the defendant's apartment. The search turned up over $7000, including the $2500 and $900 in recorded bills, another ½ pound of methamphetamine, a set of scales of the type frequently used to weigh drugs or narcotics, and a supply of glassine bags frequently used to package narcotics or drugs.

On 8 June 1972 the Maricopa County Grand Jury returned an indictment charging the defendant in two counts for possession of a dangerous drug for sale. Count I related to the quantity of methamphetamine which the defendant possessed in the parking lot of the Nantucket Lobster Trap Restaurant, and Count II related to the quantity of methamphetamine later seized from the defendant's apartment during execution of the search warrant.

Prior to trial the defendant moved to suppress the State's evidence as the result of an illegal wiretap. At the conclusion of the hearing on the motion to suppress the trial court determined that there was no nexus between the evidence upon which the State built its case and the wiretap conducted by the Phoenix police, and therefore denied the defendant's motion without reaching the question of the constitutionality of the wiretap statute.

The defendant also made a motion in limine prior to trial to prevent the State's

presenting any evidence concerning the 3 June supervised sale for which no charges had been brought. That motion was likewise denied.

The defendant waived his right to a jury, and went to trial before the court. The informant, Vigerito, was not available and did not testify. The defendant testified on his own behalf. He admitted all substantial elements of the crime, but claimed he was entrapped into committing the offense. The court adjudged the defendant guilty of Count I of the indictment, but dismissed Count II. After a hearing in aggravation and mitigation the defendant was sentenced to from 25 years to life. However, that sentence was later vacated, and the defendant was resentenced to from one year to life pursuant to a previous decision of this court, State v. Hays, 109 Ariz. 123, 506 P.2d 254 (1973), which decision was, after the resentencing in this case, reversed. State v. Lewis, 109 Ariz. 466, 512 P.2d 9 (1973).

## WAS THE STATE'S EVIDENCE THE RESULT OF AN ILLEGAL WIRETAP?

■ The defendant's first argument is two-prong. He argues that the statute pursuant to which the wiretap on his phone was authorized was unconstitutional. He then argues that the State's case was built, at least in part, from information obtained through the illegal wiretap. He concludes that the State's evidence should therefore have been suppressed as the fruit of a poisonous tree. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We need not determine the constitutionality of former § 13–1057 A.R.S., 1968, repealed by § 1, Ch. 149, Laws of 1972, for we agree with the finding of the trial court at the close of the hearing on the motion to suppress that there was no connection between the case built by the Department of Public Safety and information which may have been gleaned from the Phoenix Police Department's wiretap.

At the hearing on the motion to suppress, four law enforcement officers testified. Three of the officers, Detective Koelsch, Sergeant Moody, and Agent Dowd, were employed by the Department of Public Safety and were directly involved in the investigation and arrest of the defendant. The other officer, Patrolman Lash, was employed by the Phoenix Police Department and was one of three officers who had monitored the wiretap on the defendant's phone.

Patrolman Lash testified that in December, 1971, he had arrested Vigerito for narcotics violations. He stated that beginning with that arrest he had talked to Vigerito on several occasions concerning his relationship with the defendant, and that he had suggested that Vigerito might benefit if he were to assist the police in apprehending the defendant. The wiretap on the defendant's phone commenced on 21 April 1972 and continued until 11 May 1972. Lash testified that he did not have any conversations with Vigerito during that entire period, although he admitted that in monitoring the wiretap he had heard conversations between the defendant and someone called "Mike" whom he believed to be Vigerito. On or about 26 May 1972, after the wiretap had ceased, Detective Koelsch was contacted by Darla Merrill, and he met with Vigerito later that same day. On 29 May 1972 Koelsch called Lash to discuss the possible dismissal of charges against Vigerito and Merrill. During the course of the conversation Lash indicated to Koelsch that Vigerito could probably be of assistance to the Department of Public Safety. When asked by defense counsel on what he based his opinion Lash replied:

"* * * I based that statement on the fact that I received information in January or December of 1971 reference Michael Vigerito and his narcotics transactions and that Michael Vigerito obtained his narcotics from the big man, Carl. Based on the information I had from a confidential, reliable informant I served a

search warrant on Mike Vigerito and Darla Merrill and obtained a large quantity of narcotics and subsequently the charges that brought us here today. I had three if not more contacts with Michael Vigerito and found in my opinion that this man could not lie. He seemed to have always to tell the truth. The bulk of his information that he gave me at the time supported what I knew from other informants, other police officers from the City of Phoenix, Department of Public Safety and Bureau of Narcotics and Dangerous Drugs, all of whom I have talked to, and had numerous conversations with reference to the defendant and possible narcotic transactions."

He added, however, that he didn't know whether or not hearing what he thought to be Vigerito's voice on the wiretap had bolstered his opinion with respect to Vigerito's potential usefulness.

Detective Koelsch, when examined, stated that he had not received any information from either Patrolman Lash or any other Phoenix Police officer as to the results of the wiretap, but only knew that there had been one.

Sergeant Moody testified that he had not received any information concerning the wiretap from anyone at the Phoenix Police Department. Agent Dowd testified that he had received information concerning the defendant's source of drugs in Mexico, but that he was told nothing concerning the informant Vigerito.

It would appear from the record established in this case that the trial court was justified in finding that there was no nexus between the decision to utilize Vigerito as an informant and the wiretap conducted by the Phoenix Police Department. The evidence supports the conclusion that Vigerito initiated contact with the Department of Public Safety without any encouragement from the Phoenix police; that before Detective Koelsch could consider using Vigerito as an informant he had to first determine whether or not the Department could comply with Vigerito's demands;

that Koelsch contacted Patrolman Lash to make such a determination because Lash had been instrumental in the previous arrests of Vigerito and Darla Merrill; that during the course of the conversation Lash rendered an opinion that Vigerito would be useful, without indicating the basis for that opinion, but which had in fact been formed long before the wiretap on defendant's phone. We find that the record supports the trial court's conclusion that the evidence compiled by the Department of Public Safety was independent of the wiretap conducted by the Phoenix Police Department, and the motion to suppress was therefore properly denied.

## DID THE COURT ERR IN ALLOWING EVIDENCE OF THE PRIOR SALE?

■ Evidence of a prior bad act of a defendant is generally inadmissible because of its prejudicial effect and lack of probative value concerning the crime with which the defendant is charged. State v. Hunt, 91 Ariz. 149, 370 P.2d 642 (1962). The danger feared is that guilt may be inferred from past misconduct which is immaterial to the question of whether or not the defendant is guilty of the crime with which he is charged.

The defendant urges that the court erred in denying his motion in limine to prevent the State's presenting any evidence relating to the possession and sale of methamphetamine on 3 June 1972, for which he was not charged.

In ruling on the defendant's motion in limine the court stated:

"The Court has heretofore reviewed the motion in limine to preclude from receiving in evidence the facts and circumstances surrounding an alleged sale of dangerous drugs on the 3rd of June, 1972, and has reviewed the authorities submitted by the State and the defendant. It is the ruling of the Court that the evidence is admissible. The motion in limine is denied. The evidence is ad-

missible for the sole purpose of having a bearing or no bearing on the substantive intent of the defendant in the event there is evidence of his possession of dangerous drugs on the 5th of June and has no bearing on the question of guilt or innocence so far as the corpus delicti of possession on the 5th of June is concerned, but only on substantive intent in the event there is evidence of possession. * * *"

■ . We feel that the evidence was clearly admissible for the purpose indicated. We have directly reached the issue in State v. Vallejos, 89 Ariz. 76, 358 P.2d 178 (1960), where we stated:

"As a general rule evidence of separate and distinct crimes is inadmissible. This rule and its exceptions are ably set out in Dorsey v. State, 25 Ariz. 139, 213 P. 1011. One such exception is the showing of intent. Ordinarily proof of the acts of possession or sale are sufficient to show intent and therefore would exclude evidence of other crimes. But the defense of entrapment puts the predisposition and criminal intent in issue in a way which makes additional proof of intent necessary. When such condition exists we have held that 'evidence of other offenses of a similar nature committed by the defendant is admissible for the purpose of proving intent.' Hightower v. State, 62 Ariz. 351, 355, 158 P. 2d 156, 158. See also Richardson v. State, 23 Ariz. 98, 201 P. 845; People v. Outten, 13 Ill.2d 21, 147 N.E.2d 284; United States v. Santore, D.C.E.D.Penn., 164 F.Supp. 362 affirmed 3 Cir., 270 F. 2d 949 (where other transaction evidence was admitted on issue of entrapment)." 89 Ariz. at 80, 358 P.2d at 180. See also State v. Tisnado, 105 Ariz. 23, 458 P.2d 957 (1969); State v. Turner, 104 Ariz. 469, 455 P.2d 443 (1969).

In Vallejos, supra, we also answered the contention in the defendant's reply brief that there was some irregularity concerning the admission of the evidence in the State's case in chief, before the entrapment defense was raised. We stated:

"It is a universal rule that the trial judge must have some discretion in the order of the admissibility of evidence. James v. State, 53 Ariz. 42, 84 P.2d 1081; State v. Cruce, 61 Ariz. 233, 147 P.2d 698; State v. Folk, 78 Ariz. 205, 277 P.2d 1016. In view of the record in this case we cannot sustain defendant's claim that the order of admission in this case in any way prejudiced his rights. The estate was not bound, when defense had already begun to lay the foundation for a defense of entrapment, to wait until after the defendant took the stand to counteract that defense. The evidence that the defendant committed the acts charged was so overwhelming that the state could reasonably anticipate that defendant's plea of innocent was based on a defense of entrapment." 89 Ariz. at 81, 358 P.2d at 181.

■ Since evidence of prior acts is admissible for the purpose of showing the intent of the accused in an entrapment case, and since there is nothing in the record to indicate that the trial judge, as trier of fact, utilized the evidence for any other purpose, we hold that the court did not err in allowing evidence of the facts and circumstances surrounding the transaction of 3 June 1972.

## WAS THE PACKAGE OF DRUGS ADMITTED WITHOUT PROPER FOUNDATION?

Prior to the sale of 3 June Officer Beasley of the Department of Public Safety searched the automobile to be used by Vigerito and determined that it contained no narcotics. Vigerito drove the car to the Hobo Joe's Restaurant parking lot where he met the defendant. Although Vigerito was under surveillance, none of the officers involved actually saw the defendant hand him any drugs. Although the testimony is confusing at this point, it appears that after Vigerito left the parking lot at

Hobo Joe's the officers lost visual contact with Vigerito. Later Vigerito returned to the Department of Public Safety headquarters and gave Officer Beasley a package containing approximately four ounces of methamphetamine. At trial Officer Beasley identified State's exhibit 6 as the methamphetamine he had received from Vigerito on 3 June. When the State attempted to admit the exhibit in evidence the defendant objected on grounds of insufficient foundation.

■■ It is a general rule that before physical evidence may be received in evidence, the party offering it must lay a foundation. It must be identified as the object in question and there must be shown a chain of custody. This is particularly true of narcotics which are susceptible to alteration or substitution. State v. Davis, 110 Ariz. 51, 514 P.2d 1239 (1973). Vigerito, of course, did not testify. We agree that without the testimony of Vigerito, the State did not lay a sufficient foundation. State v. Hunt, 91 Ariz. 149, 370 P.2d 642 (1962). We do not believe, however, that the admission of the exhibit requires reversal of this case. In the first place, the exhibit was related to the 3 June sale, and no criminal charges resulted from that transaction. Secondly, the defendant himself admitted having sold methamphetamine to Vigerito on 3 June, and that admission figured prominently in the defendant's entrapment defense. We do not feel that the admission of the exhibit was prejudicial, and we therefore hold that the error was not reversible.

## WAS THERE ENTRAPMENT AS A MATTER OF LAW?

Defendant finally contends that the court erred in rejecting his defense of entrapment. He claims that his testimony at trial raised a substantial defense of entrapment which was uncontradicted by the State, and which should therefore have been accepted by the trial court as fact. He relies on State v. Boccelli, 105 Ariz. 495, 467 P.2d 740 (1970) and State v. McKinney, 108 Ariz. 436, 501 P.2d 378 (1972),

to support his claim that entrapment was established as a matter of law.

■■ In a long line of cases this court has held that entrapment exists when it is shown that the intent to commit the crime alleged did not arise in the mind of the accused, but rather, was the result of the creative activity of law enforcement officers. Entrapment does not exist where law enforcement officers have merely afforded an opportunity for a predisposed person to commit a crime. State v. Deschamps, 105 Ariz. 530, 468 P.2d 383 (1970); State v. Rabon, 100 Ariz. 344, 414 P.2d 726 (1966); State v. Thurston, 100 Ariz. 297, 413 P.2d 764 (1966); State v. Gortarez, 98 Ariz. 160, 402 P.2d 992 (1965); State v. Hernandez, 96 Ariz. 28, 391 P.2d 586 (1964). In later cases we indicated that in addition to the subjective intent of the accused to commit the crime, the extent of involvement by the law enforcement officers is also pertinent to the issue of entrapment. Thus, in State v. Boccelli, supra, we stated:

"Entrapment is a question for the jury unless there is no evidence to support the defense, State v. Reyes, 99 Ariz. 257, 408 P.2d 400, or unless uncontradicted testimony makes it *patently clear* that an otherwise innocent person had been induced to commit the acts. In this latter event, entrapment is established as a matter of law, State v. Rabon, supra. * * * (emphasis added)

"The sum of the uncontradicted testimony is that the State's agents supplied all the ingredients of the offense: the plan, the marijuana, the buyer, the money for the purchase. Finally, even the intent to sell was implanted by Richardson's inquiry of appellant as to how much he wanted for the 'grass'. The criminal conduct is clearly the product of the creative activity of the law enforcement officers.

"But were it possible for reasonable men to differ with our conclusion that the intent to sell was implanted in appellant's mind by the question as to how much he,

appellant, wanted for the marijuana, the evidence is uncontradicted that the State's agents placed in commerce the narcotic, the trafficking in which is absolutely forbidden by the legislative act." 105 Ariz. at 497, 467 P.2d at 742.

And, likewise, in State v. McKinney, supra, we stated:

> "At the trial defendant took the stand in his own defense and related a story of entrapment. It was defendant's version that the informant had been a seller or dealer in narcotics, that he had asked defendant to make the particular sale with which we are concerned here, that the informant made all initial contacts with the government agents, and that the informant actually supplied the marijuana to be sold on the 14th of August. * * *

> *       *       *       *       *       *

> "Whenever the evidence is sufficient to support a valid instruction for entrapment it must be given, State v. Rabon, 100 Ariz. 344, 414 P.2d 726 (1966), State v. Martin, 106 Ariz. 227, 474 P.2d 818 (1970), but where the evidence raises a *substantial and reasonable* defense of entrapment and the State does nothing to rebut or contradict the defense, entrapment as a matter of law is established. Boccelli, supra. In the instant case, not only did the State fail to rebut the defense of entrapment once it was substantially raised, but the inference is strong that by refusing to reveal the name of the informant until trial, and by not making him available for examination at trial, the State has knowingly prevented defendant from further presenting his defense." 108 Ariz. at 438, 441, 501 P.2d at 380, 383. (emphasis added)

The distinction between the situations in Boccelli and McKinney, supra, and the situation herein is most readily apparent with respect to the degree of involvement of the law enforcement officers. Clearly the extent of involvement in the instant case is less, for the drugs possessed by the defendant Petralia were not supplied by agents of the government. In addition, in both Boccelli and McKinney the defendant's claim of entrapment found support in evidence other than just the testimony of the defendant himself. We have at the outset, then, a situation in which the defense of entrapment is less "patently clear" and less "substantial and reasonable" than the defenses presented in both Boccelli and McKinney. Since the involvement of government agents was minimal and unoffensive our primary inquiry must focus on the intent of the defendant to possess the drugs which he sold to the informant Vigerito.

As to the second sale the defendant testified:

> "Q   Did he say why he had the sudden change of heart within two days from begging and pleading and giving you the sob story, part of which was Darla's condition and now he dumped her?

> "A   He told me, he said—we had talked about it previously, about her habit and his cases and everything and I kept telling him, 'Most of your problem is Darla.' I said, 'If you would get rid of her you would lose —you know, you wouldn't have to make all this money to support her habit.' And that morning he came to me and said, 'You know? You were right.' He said, 'Darla and I had a big argument. I finally got rid of her and I can see you were right, that she is my problem and everybody had been telling me this but I haven't been paying any attention to them. Now that she is gone I can see I don't have to make this money to support her habit.' He said, 'Now I am going to make it for myself if you can arrange it for me.'

> "Q   At some point in the conversation he came up with the statement, 'I

have $2500 if you will sell,' or words to that effect; is that correct?

"A He said, 'I've got $2500 if you can get me what I need. If you can get me the speed.'

"Q How did this figure of $2500 come up?

"A Probably some deal in one of the conversations he asked me how much approximately would a pound cost.

"Q How did you know approximately how much a pound would cost?

"A I didn't. I just came up with the figure of $2500.

"Q You just picked it out of the air? You heard the officer say the words 3,000—or $300 an ounce. That is $4800 a pound. So you just came up with an arbitrary figure of $2500, so your arbitrary figure was a little low, would you say?

"A Well, it wasn't low because when I contacted these people they agreed to sell it.

"Q They agreed to sell how much for the $2500?

"A Eight ounces.

"Q So if it goes for $300 an ounce, that is $4800 a pound, half a pound, $2500 isn't far off, is it?

"A No. He was talking $2500 a pound. I don't know where he got that figure. The $2500 was for eight ounces.

"Q You heard the officer testify as to the going weight per ounce, et cetera, and you would agree, would you not, that the $2500 for eight ounces is about right?

      *     *     *     *     *     *

"A At those figures it works out.

"Q So then you said, 'Okay, go and get the money and come back in about 20 minutes;' is that right?

"A I asked him how long it would take him to go get the money. He said

half an hour. He came back in 20 minutes."

The State was unable, without Vigerito, to rebut the testimony given by the defendant concerning the pressure Vigerito allegedly put on defendant. We do not believe, however, that the defendant has established entrapment as a matter of law. The trial judge, as trier of fact, was free to judge the defendant's credibility and to weigh his testimony in light of all the facts and circumstances of the case. We conclude, then, that the defendant did not establish entrapment as a matter of law, and the trial court was justified in rejecting the defense.

## SHOULD THE ORIGINAL SENTENCE BE REINSTATED?

On 5 February 1973 this court filed its opinion in State v. Hays, 109 Ariz. 123, 506 P.2d 254 (1973), in which we held that § 32–1996(C) A.R.S. is mandatory, and the trial court must sentence a defendant convicted under that statute to a period of from one year to life. On 6 March 1973 the defendant herein, who was sentenced to a term of from 25 years to life, filed motions with this court to suspend his appeal and to have his case remanded for resentencing in accordance with Hays, supra. The State filed an opposition to the motions, and on 20 March 1973 we ordered that the defendant's appeal be suspended and that his case be remanded for resentencing. On 29 June 1973 the defendant was resentenced to a term of from one year to life. On 17 July 1973 we overruled our decision in Hays, supra, and held that any term within the prescribed minimum and maximum of an indeterminate sentence is permissible. State v. Lewis, 109 Ariz. 466, 512 P.2d 9 (1973). Clearly, under our decision in Lewis, supra, the original sentence imposed in this case would now be legal.

In any event, the sentence of from 1 year to life is not illegal, § 13–1712(6) A.R.S. Assuming arguendo that the State would have the right to appeal this ques-

tion as "a ruling on a question of law adverse to the state when the defendant was convicted and appeals from the judgment," § 13–1712(4) A.R.S., we find that the prior order of this court in ordering that the defendant be resentenced pursuant to Hays, supra, has become the "law of the case" even though we have subsequently determined that our interpretation of the law was erroneous. We therefore decline to reinstate the original sentence or to remand the case for yet another resentencing.

The judgment of guilt and the sentence of from one year to life are hereby affirmed.

HAYS, C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.