546 P.2d 831

The STATE of Arizona, Appellee,

v.

Harry Earl KISER, Appellant.

No. 2 CA–CR 705.

Court of Appeal of Arizona,
Division 2.

March 5, 1976.

Rehearing Denied April 14, 1976.
Review Denied May 11, 1976.

Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III, and Frank T. Galati, Asst. Attys. Gen., Phoenix, for appellee.

Chandler, Tullar, Udall & Richmond, by Robert E. Lundquist, Tucson, for appellant.

## OPINION

KRUCKER, Judge.

Appellant, Harry Earl Kiser, was charged with unlawful sale of heroin on July 6, 1972, in violation of A.R.S. § 36–1002.02 (Supp.1971–72). He was convicted at his first trial, but the trial court subsequently granted his motion for a new trial. This ruling was affirmed on appeal. 111 Ariz. 316, 529 P.2d 215. Appellant was tried a second time, convicted, and sentenced to five to seven years in the state prison. He has now perfected this appeal.

Appellant raises numerous contentions on appeal: (1) The evidence established entrapment as a matter of law; (2) the State failed to carry its burden of proof beyond a reasonable doubt that he was not entrapped; (3) a new trial is required because certain testimony of an undercover narcotics agent was unduly prejudicial; (4) the trial court erred in refusing to give an instruction on the offense of possession of heroin; (5) the case should be remanded for resentencing because the trial court assumed that appellant would be eligible for "two-for-one" time when it passed sentence.

The case arose thusly. In June and July of 1972, appellant was a heroin addict. On July 5, 1972, he injected himself with a full "paper" (150 mg.) of heroin. The next day he and his brother began drinking in the morning and continued through the day. At about 8:00 p. m. they sat down on a bus bench on Speedway Blvd. in Tucson to wait for a bus that would take them to Ray and Red's, a bar on North Fourth Avenue.

At that time Officers Pershing and Conrad, who were acting as undercover narcotics agents, were driving west on Speedway in an unmarked vehicle. They spotted appellant and his brother by the bus bench, and Pershing decided to stop. The agents then offered them a ride and they accepted it. On entering the car they saw that Pershing wore an earring and had long hair covering his head and face. In addition, he had half a dozen swollen and discolored "tracks" in the veins of the inside of his arm. He later testified he was portraying a heroin addict. Appellant's testimony shows that when he first met Pershing he was not much impressed by his "tracks," and paid little attention to them. Conrad was also unkempt, but had no "tracks."

As the car again proceeded west on Speedway, the agents introduced themselves

and said they were from out of state. After a bit of conversation, appellant offered to sell the agents his radio. The agents pulled their car off Speedway onto a side street to examine it. Pershing testified that he said he did not want it and asked, "Do you know where I could cop any stuff?" Appellant testified that Pershing said he was not interested in the radio but would buy it if appellant would get him some heroin. According to appellant, he refused to do so. Appellant's brother, Tom, then told Pershing that if he wanted drugs he could buy them at Himmel Park. Pershing wheeled the undercover car around and drove to Himmel Park. Appellant did not object to going and decided he might be able to sell his radio there. Appellant's brother testified that appellant and the agents may have agreed to go to Himmel Park so appellant could procure drugs.

Pershing drove the car into the north parking lot of Himmel Park and stopped. Appellant offered to sell the radio to Pershing for ten dollars and Pershing refused. He told appellant he would buy the radio if appellant could "cop some stuff" for him and appellant again declined. Appellant then got out of the car and attempted to sell his radio to someone in the park. Meeting with no success, he returned to the car after about five minutes.

The agents testified that when appellant re-entered the car he said he wanted to sell the radio because he was a junky and wanted to buy some heroin. Pershing said he could "get off" on some dope, but neither agent feigned any symptoms of withdrawal. The agents testified that appellant then said he could buy some heroin for Pershing, who then gave appellant twenty dollars. Appellant left and returned shortly with two packets of heroin. He gave one to the agent.

Appellant testified that when he returned from his first attempt to sell his radio, he offered it to Pershing for successively lower prices. Each time Pershing said he would give him ten dollars for it if he would "cop some dope." Appellant testi-

fied that he refused and that the agents then started to talk about heroin among themselves. Pershing told appellant he needed a full paper to "get off with." According to appellant, Pershing also told him he had "shot up" 12 hours ago and asked what kind of "junk" was being sold in the park. Appellant replied that it was Mexican "junk" and the agents started to discuss the merits of Chinese "junk" as opposed to Mexican "junk." Appellant testified that he originally sought to sell his radio so he and his brother could drink some more, but:

"A. Well, I knew he needed dope. He was showing me his track marks and telling me his habit and everything else. He said he needed it. He got me wanting it, too."

Q. What were they doing, going through a light withdrawal?

A. Well, kind of excited, you know, wanting drugs so bad, and if a person even chips he wouldn't go through what Pershing went through to get it.

Q. When you went to buy the heroin you were kind of excited, too, weren't you?

A. Yes.

Q. And you wanted the drug pretty bad?

A. Yes, sir."

Appellant testified that he left the car a second time to try to sell the radio, this time so he could buy heroin. He failed again and returned to the car. He then agreed to buy heroin with the twenty dollars supplied by the agent. As he left the car with the money, he asked, "How many do you want?" Someone shouted back "two" and appellant proceeded to buy two papers of heroin from a woman in the park. He returned and gave both to the agent behind the wheel, who gave one back to him at his request.

After this transaction, the agents and appellant and his brother drove toward Catalina Park on Fourth Avenue below

Speedway. Conrad testified that they then discussed the merits of the various kinds of foreign heroin. When they reached Catalina Park, Pershing asked appellant, "Can I find you later? Will you be around here or anything?" Appellant said he lived behind a house near the park and regularly hung around there. He also told Pershing to look for him if he ever wanted to buy heroin. Appellant later explained that he told him to " . . . drop back by anytime because, look, I mean, I found a new way of getting drugs so I said 'I'll cop for you.' "

Appellant first argues that it was error to submit the case to the jury because the uncontradicted evidence established entrapment as a matter of law. We must disagree. We note that beginning with the United States Supreme Court case of *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), the defense of entrapment has developed along two distinct theoretical lines. This theoretical divergence is exemplified by the majority and concurring opinions in *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). In that case the defendant and a government informant chanced to meet at a doctor's office where both were seeking treatment for narcotics addiction. The informant persistently solicited a sale of narcotics from defendant, who first refused and then tried to avoid the issue. He finally acquiesced, however, after the informant repeated his request many times and said he was suffering because the doctor's treatment was not working for him. The court reversed defendant's conviction. It stated entrapment occurs when the defendant's criminal conduct was the product of the creative activity of law enforcement officials. The court adhered to the view that entrapment *vel non* turns on whether the intent to commit the crime originated with government agents or

with the defendant, and that on this issue the defendant's conduct and predisposition were material.

The court declined to follow the separate opinion of Justice Roberts in *Sorrells v. United States*, supra, in which he expressed the view that the entrapment defense was justifiable only as a device to sanction unacceptable activity by government agents, and hence a defendant's own intent was immaterial. In his concurring opinion in *Sherman*, however, Justice Frankfurter strongly urged acceptance of Justice Roberts' earlier view. He stated:

"The crucial question, not easy of answer, to which the court must direct itself is whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power. For answer it is wholly irrelevant to ask if the 'intention' to commit the crime originated with the defendant or government officers, or if the criminal conduct was the product of 'the creative activity' of law-enforcement officials." 356 U.S. at 382, 78 S.Ct. 825, 2 L.Ed.2d at 856 (Frankfurter, J., concurring)[1]

Some cases have adopted the Frankfurter-Roberts rationale, including *State v. Sainz*, 84 N.M. 259, 501 P.2d 1247 (1972), upon which appellant relies. In *Sainz* the New Mexico Court of Appeals used the following language:

"When the state's participation in the criminal enterprise reaches the point where it can be said that except for the conduct of the state a crime would probably not have been committed or because the conduct is such that it is likely to induce those to commit a crime who would normally avoid crime, or, if the conduct is such that if allowed to continue would shake the public's confidence

---

1. We note that the United States Supreme Court has recently reaffirmed the *Sorrells-Sherman* majority view of the entrapment

defense in the federal courts in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

in the fair and honorable administration of justice, this then becomes entrapment as a matter of law. (Citations omitted)" 501 P.2d at 1249.

The entrapment defense as discussed in *Sainz* is essentially this: if a reasonable person in the defendant's position would have been induced to commit a crime by the undercover agent's conduct, then the defendant must be acquitted even though the intent to commit the particular crime with which he is charged in fact originated with him. We cannot agree with this statement of the entrapment defense. Persons charged with crimes are not instrumentalities for the control of police conduct and they should not be treated as such by the substantive criminal law. The guilt or innocence of a criminal defendant should instead depend as far as possible on his own conduct and intent. We therefore agree with the majority opinions in *Sorrells v. United States*, supra, and *Sherman v. United States*, supra, that the issue in an entrapment case is not whether the officers' conduct would have induced a reasonable man to commit a crime, but whether it in fact induced the defendant to commit the crime contrary to his normal inclinations.

Although no Arizona court has previously had occasion to make a choice between the opposing theoretical bases for the entrapment defense, prior Arizona cases have consistently followed the one adopted by the majority opinions in *Sorrells* and *Sherman*. In *Hoy v. State*, 53 Ariz. 440, 90 P.2d 623 (1939), our Supreme Court stated:

"It is not ordinarily permissible for any person, in order to secure the conviction of another upon a criminal charge, to procure him to commit a crime. But there is a very clear distinction between inducing a person to commit a crime, and setting a trap to catch him in the execution of criminal designs of his own volition. It is the general rule, therefore, that when the doing of a particular act is a crime, regardless of the consent of any person, if the criminal intent originates in the mind of the accused and the

criminal offense is completed by him, the fact that the opportunity for the crime is furnished, or that the accused is even aided in the commission of the crime in order to secure the evidence necessary to prosecute him therefor, constitutes no defense." 53 Ariz. at 453, 90 P.2d at 628.

In *State v. Duplain*, 102 Ariz. 100, 425 P.2d 570 (1967) the court stated, quoting from *State v. Hernandez*, 96 Ariz. 28, 391 P.2d 586 (1964):

"'* * * a crucial element of the defense of entrapment is that the intent to commit the crime must not arise in the mind of the accused. * * * the defense of entrapment does not arise where one is ready to commit the offense given but the *opportunity* * * *'" 102 Ariz. at 101, 425 P.2d at 571.

Appellant contends that our Supreme Court recognized the Frankfurter-Roberts view in *State v. Petralia*, 110 Ariz. 530, 521 P.2d 617 (1974) and *State v. Boccelli*, 105 Ariz. 495, 467 P.2d 740 (1970). It is true there is language in both opinions that focuses on the extent to which police officers are involved in the commission of the crime. See, *Petralia*, 110 Ariz. at 536, 521 P.2d 617; *Boccelli*, 105 Ariz. at 497, 467 P.2d 740. Similar language appears in *State v. McKinney*, 108 Ariz. 436, 439–40, 501 P.2d 378 (1972).

We do not agree, however, that under *Petralia, McKinney* and *Boccelli*, entrapment may be proved as a matter of law solely by reference to the objective character of police conduct. All three cases recognized the rule that entrapment is established where the criminal conduct was the *product* of the creative activity of law enforcement officials, and that there must be activity by such officials in the nature of an *inducement* to commit a crime the accused would not otherwise have committed. We therefore believe that in focusing on police conduct, the court in *Petralia, McKinney* and *Boccelli* was merely recognizing that the question of whether a defendant was induced to commit a crime against his

natural inclinations must be answered in part by examining what the officers actually did in the particular case. *See also, State v. Masengill*, 110 Ariz. 310, 518 P.2d 560 (1974).

■ The question of whether the intent to sell heroin originated with appellant as a matter of law must therefore be resolved by considering not only what Agents Pershing and Conrad did, but also what appellant himself did. The undisputed evidence establishes that Pershing, who was portraying a heroin addict, told appellant several times that he would buy appellant's radio if appellant would buy heroin for him. It further establishes that after appellant unsuccessfully attempted to sell his radio at Himmel Park, Pershing told him he needed a full paper to "get off with." Appellant thereafter accepted twenty dollars from Pershing and bought heroin for him, retaining some for himself. This evidence would raise at most a jury question of entrapment.

The details of exactly what occurred between Pershing and appellant are all disputed, or at least subject to widely divergent inferences. Appellant's account of what occurred after he returned from his attempt to sell his radio shows substantial psychological pressure and conscious efforts to play on his craving for heroin. The agents' testimony, however, supports the conclusion that appellant needed no persuasion to buy heroin for them and readily offered to do so when Pershing said he could "get off" on some heroin. Contrary to appellant's testimony, appellant's brother testified that appellant and the agents, while still in the car, might have agreed to go to Himmel Park so appellant could buy drugs. Further, the agents testified that at no time did they exhibit withdrawal symptoms. In addition, contrary to appellant's testimony, Agent Conrad testified that the conversation concerning the merits of the various kinds of foreign heroin took place after the heroin sale while the car was en route to Catalina Park. Moreover, appellant told the agents

after the sale to look for him if they ever wanted to buy heroin again. Finally, appellant's testimony shows he was unimpressed by Pershing's "tracks." We think appellant was not entrapped as a matter of law and there was substantial evidence in support of the verdict.

*Grate v. State*, 529 P.2d 1001 (Okl.Cr. 1974), relied on by appellant, is not in point. There, a police informer, who was suffering obvious withdrawal symptoms, begged defendant to find her some heroin. Further, the undercover officer who was present at the time admitted "in all sincerity" that defendant went out of his way as a favor to locate and deliver the heroin. In the case at bar, the proof of inducement is far less strong. The trial court did not err in submitting the case to the jury.

■ Appellant next contends that a new trial is required because certain portions of Agent Pershing's testimony were unduly prejudicial. Before trial, the court granted appellant's motion *in limine* to preclude any testimony by Pershing that appellant had told him he had stolen the radio from a house. The court also instructed the prosecutor to caution Pershing about such testimony. The prosecutor neglected to do so and the following exchange took place:

"A. [Pershing] I asked him, 'What kind [of radio it was]?'

Q. [By Mr. Scholl] And what did he say?

A. He said he wasn't too sure. He just got it from a pad, meaning a house."

Appellant contends the trial court erred in failing to declare a mistrial because this testimony violated the trial court's order and tended to show that appellant had committed a prior bad act. Although we agree that the prosecutor's neglect was inexcusable, we do not think it requires a new trial. We agree with the following statement by the trial court:

"I grant it is a violation of the order, there is no question about that. Of

course, I'm not a member of the jury and I'm not the one sitting there. As I told you before, I didn't have the feeling that what he said implied that he stole the radio from a house in the way it came out."

■ During the trial the following exchange also occurred:

"Q. [By Mr. Scholl] Why do you give people rides when you are working in that narcotics agent capacity?

[Defense Counsel] I object as irrelevant.

THE COURT: Overruled.

A. [Pershing] It is one of the forms in which contacts are made. On many occasions that is the way street buys are made, and that is what our job was. A lot of people were selling in that manner, hitchhiking rides and selling at the same time."

Appellant apparently contends that the witness's last statement unduly prejudiced him by implying that he was selling heroin because other hitchhikers were known to do so. We disagree. The answer was clearly material because it tended to show the agents did not single out appellant capriciously. Unlike the situation in *State v. Green,* 110 Ariz. 293, 518 P.2d 116 (1974), cited by appellant, the witness did not assert directly that appellant was known as a narcotics dealer. The prejudice engendered by the witness's statement was so attenuated that if there was any error it was harmless beyond a reasonable doubt.

■■ Appellant next contends the trial court erred in refusing to instruct the jury that it could convict him of the lesser included offense of possession of heroin. We disagree. Under *State v. Ballinger,* 110 Ariz. 422, 520 P.2d 294 (1974) an instruction on the lesser included offense of possession should not be given where possession of the drugs was obtained solely for the purpose of the particular sale. This rule has been applied where the defense was entrapment. *State v. Altman,* 107 Ariz. 93, 482 P.2d 460 (1971). Here,

appellant obtained possession of the heroin for the sole purpose of turning it over to Agent Pershing. Under *Ballinger,* the offense of possession was merged into the sale and the instruction on possession was properly refused. Appellant argues that he could have been convicted of possession because the jury could have found predisposition to possess heroin and rejected the entrapment defense on that charge. We disagree, for under the facts the offense of possession was merged into the sale notwithstanding predisposition to possess.

■■ The transcript of the hearing on the motion for resentencing shows that the trial court believed appellant would be entitled to have the credits provided in A.R.S. § 31–251 (Supp.1975) and § 31–252 (Supp. 1975) applied against the minimum sentence imposed on him for violation of A.R.S. § 36–1002.02. Appellant's counsel states in his opening brief that the Department of Corrections has informed him that because the offense occurred in 1972 (before Op. Atty.Gen. 63–35 was disapproved by Op. Atty.Gen. 73–13) appellant will be eligible for these statutory credits. As our Supreme Court has held, however, the statutory credits cannot be applied against a minimum sentence imposed under A.R.S. § 36–1002.02 even where the offense took place while Op.Atty.Gen. 63–35 was in effect. *State of Arizona; Cardwell v. Deddens,* 112 Ariz. 425, 542 P.2d 1124 (1975); *State v. Masengill,* supra. Further, contrary to the position of both appellant and appellee, applying the mandatory minimum sentence provision of A.R.S. § 36–1002.02 to a case that arose before Op. Atty.Gen. 73–13 was issued does not violate the *ex post facto* clause of Art. 1, § 10 of the United States Constitution. *State; Cardwell v. Deddens,* supra.

■ However, as the court stated in *Masengill:*

"It is apparent that the judge thought he was sentencing the defendant to an ordinary term, allowing him credit for

double time. Under the provisions of A.R.S. § 36–1002.02 under which the defendant was convicted, he would not be eligible for release until he had served a minimum of five years. For this reason the case is returned so that the trial judge may reassess his sentence." 110 Ariz. at 312, 518 P.2d at 562.

We think that a remand for resentencing is likewise required here.[2]

The judgment of conviction is affirmed and the case is remanded for resentencing.

HOWARD, C. J., and HATHAWAY, J., concur.

**2.** We note that contrary to appellant's contention, requiring a person convicted of unlawful sale of heroin to serve a minimum of five years does not constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution. *State v. Guthrie,* 111 Ariz. 471, 532 P.2d 862 (1975).