690 P.2d 98

The STATE of Arizona, Appellant,

v.

Gerard Martin GESSLER, Mark Warren Bargar, William Hamilton Prust, Michael David McCarthy, and Robert Thomas Jackson, Appellees.

No. 2 CA–CR 3290.

Court of Appeals of Arizona, Division 2.

July 19, 1984.

Review Denied Oct. 30, 1984.

Stephen D. Neely, Pima County Atty. by William R. Stevens, Jr., Tucson, for appellant.

Walter B. Nash III, Tucson, for appellee Gessler.

Michael L. Piccarreta, Tucson, for appellee Bargar.

Peter Keller, Tucson, for appellee Prust.

Roger Auerbach, Tucson, for appellee McCarthy.

Frederic J. Dardis, Pima County Public Defender by Lawrence Fleischman, Tucson, for appellee Jackson.

## OPINION

HOWARD, Judge.

This case presents a question of first impression for consideration by Arizona courts: whether existing Arizona law precludes undercover narcotics agents from offering to sell or pretending to sell narcotics or marijuana to predisposed persons who have expressed an interest in making such purchases. The trial court found that existing Arizona law precludes such activity. We do not agree.

The charges in the instant action stem from the sale of marijuana by undercover narcotics agents to allegedly predisposed individuals. Appellees were charged with conspiracy to possess marijuana for sale, a class 4 felony, and conspiracy to transport, import into this state, sell, transfer or offer to transport, import into this state, sell or transfer marijuana, a class 2 felony.

Law enforcement personnel worked in conjunction with the Pima County Attorney's Office to present a test case and to prepare procedural guidelines for this reverse narcotics transaction drug enforcement technique. The operation began about three years earlier when Sergeant David Gonzalez of the Department of Public Safety (DPS) became aware of the "reverse buy" technique then being used by the United States Drug Enforcement Administration (DEA). The opportunity to try this technique apparently arose when a paid DEA confidential informant named Adalberto Noriega approached DEA special agent Thomas Gomez with the possibility that someone wanted to buy a large quantity of marijuana. The informant had met appellee Gessler in 1980 and was familiar with Gessler's interest in marijuana transactions. In early October 1982 the informant was approached by Gessler who asked him about procuring substantial quantities of marijuana. Shortly thereafter, the informant began to arrange contact

between Gessler and undercover narcotics agents.

On October 22, 1982, agent Gomez met with appellee Gessler at a Tucson motel and, at that time, decided to attempt a reverse buy. Following this initial contact, the informant had no further significant involvement in the transaction. During initial discussions, the quantity and quality of marijuana, price per pound, location and mode of delivery were discussed. In subsequent meetings with undercover narcotics agents, appellees Gessler and Bargar identified their interest in large volume marijuana transactions of approximately two to five thousand pounds per week and indicated that they had conducted extensive past dealings in marijuana.

During preliminary negotiations at a meeting on October 24, appellee Gessler told agent Gomez that he wanted to purchase a sample to take to his associates. Gomez refused to sell the marijuana but permitted Gessler to take three or four flower tops of the marijuana as a sample.

On October 25, 1982, DPS and DEA agents were shown the situs chosen by appellees for the transfer and weighing of the marijuana, Bargar's residence. During this meeting, Bargar stated to agents that he and Gessler had been dealing marijuana out of his house for "years and years." The agents were also shown a red van used by Gessler and Bargar in their marijuana transactions. This van had a specialized hidden compartment built into it for transportation of drugs, and appellees indicated that the van would be used in the marijuana transaction conducted with the undercover agents.

While viewing these facilities, agent Childers was shown the garage, which appellee Gessler told him was frequently used to accept their marijuana deliveries. Gessler showed agent Childers the doors and overhang to the garage, telling him how secure it was and how, during marijuana deliveries, the trucks were parked and the drugs were unloaded and weighed. At that time, agent Childers noticed that there were numerous five-gallon gasoline cans in the garage. When he questioned Gessler about these, Gessler informed him that the cans contained aviation fuel and briefly described how he and Bargar also used airplanes in their drug dealing ventures.

Gessler's and Bargar's sophistication in their approach toward and knowledge of marijuana transactions impressed the agents and led them to conclude that each had substantial experience in trafficking in marijuana. Appellee Bargar told agents of his extensive smuggling of Colombian marijuana in southern Florida and indicated that a group of people with whom he had worked in Florida importing Colombian marijuana were now operating in Detroit. He alluded to them as "family" although no consanguineous relationship existed.

During the October 25 meeting at Bargar's residence, appellee Bargar advised the agents that he needed additional samples to take to his associates in Detroit. The agents had brought approximately eight pounds of marijuana with them to demonstrate their ability to produce high quality marijuana, and DPS narcotics agent Jim Wade told Bargar to "reach in the bag and take whatever you feel comfortable with."

Another meeting took place on October 29, 1982, at which time all appellees except Jackson met with agents and conspired to receive delivery of approximately 200 pounds of marijuana for a purchase price of $40,000. During the course of this meeting, appellee Bargar told agents that he would search them for a "wire" used in electronic surveillance prior to consummating the transfer of the marijuana and the purchase money and indicated that he would be armed during the transaction. At that time, Bargar also outlined how and where the transaction was to take place, what functions each person would perform and the chronology of the transfer. Later that day, approximately 100 pounds of marijuana was delivered to Bargar's residence where it was weighed by members of the organization, thus permitting the purchase money to be turned over according to the procedure chosen by appellees. When the

money was tendered, all members of the organization were arrested. Although the agents delivered the marijuana to appellees, control over the marijuana was never relinquished. The delivery of the marijuana was necessary solely to obtain the purchase money.

The instant prosecution for conspiracy followed. Appellees challenged the state's use of the reverse narcotics transaction as violative of Arizona law and as constituting entrapment per se. Evidentiary hearings were conducted by the trial court, upon conclusion of which the court dismissed the indictment against appellees and made the following findings of fact:

"1. The Court finds no evidence here to support a claim of due process violation because of outrageous government conduct.

2. The Court finds no evidence here to suggest that otherwise innocent persons were induced by agents of the State to commit offenses to which they were not previously disposed.

3. To the contrary, there is considerable evidence to support predisposition and prior experience by defendants Gessler and Bargar in dealing marijuana.

4. The evidence is uncontradicted that small samples of marijuana (several flowers and tops, ounce quantities) were furnished by the State's agents to the defendants.

5. Since the agents here were posing as dealers of marijuana it was the agents who were to furnish the larger quantities of marijuana that defendants had agreed to purchase."

The state sought relief from this order through a special action; however, this court declined jurisdiction. The instant appeal followed.

■ Entrapment is a question for the jury unless there is no evidence to support the defense or unless uncontradicted testimony makes it clear that an otherwise innocent person has been induced to commit criminal acts. *State v. Petralia*, 110 Ariz. 530, 521 P.2d 617 (1974); *State v. Boccelli*, 105 Ariz. 495, 467 P.2d 740 (1970); *State v.*

*Mack*, 134 Ariz. 89, 654 P.2d 23 (App.1982). Entrapment as a matter of law is established where the defendant raises a substantial and reasonable defense of entrapment which makes it patently clear that he was entrapped, and where the state has done nothing to rebut the defense. *State v. Cox*, 110 Ariz. 603, 522 P.2d 29 (1974); *State v. McKinney*, 108 Ariz. 436, 501 P.2d 378 (1972); *State v. Boccelli*, supra; *State v. Mack*, supra.

■ Our supreme court has consistently held that entrapment exists when it is shown that the intent to commit the crime alleged did not originate in the mind of the accused, but rather, was the result of the creative activity of law enforcement officers. Entrapment does not exist where law enforcement officers have merely afforded an opportunity for a predisposed person to commit a crime. *State v. Petralia*, supra; *State v. Massengill*, 110 Ariz. 310, 518 P.2d 560 (1974); *State v. Deschamps*, 105 Ariz. 530, 468 P.2d 383 (1970); *State v. Duplain*, 102 Ariz. 100, 425 P.2d 570 (1967); *State v. Rabon*, 100 Ariz. 344, 414 P.2d 726 (1966); *State v. Thurston*, 100 Ariz. 297, 413 P.2d 764 (1966); *State v. Gortarez*, 98 Ariz. 160, 402 P.2d 992 (1965); *State v. Hernandez*, 96 Ariz. 28, 391 P.2d 586 (1964).

In support of their position, appellees rely upon *State v. Boccelli*, supra. In that case, our supreme court indicated that in addition to the subjective intent of the accused to commit the crime the extent of involvement by law enforcement officers is also pertinent to the issue of entrapment. The court in *Boccelli* held that in order to find that entrapment exists, there has to be activity by the state in the nature of an inducement to commit a crime which the accused would not otherwise have committed, stating:

"The sum of the uncontradicted testimony is that the State's agents supplied *all* the ingredients of the offense: the plan, the marijuana, the buyer, the money for the purchase. Finally, even the intent to sell was implanted by Richardson's inquiry of appellant as to how

much he wanted for the 'grass.' The criminal conduct is clearly the product of the creative activity of the law enforcement officers." 105 Ariz. at 497, 467 P.2d 740 (emphasis added)

 Appellees were charged with conspiracy to possess marijuana for sale and conspiracy to transport, import into this state, sell, transfer or offer to transport, import into this state, sell or transfer marijuana. It cannot be said that the state's agents supplied all the ingredients of the offense with which appellees were charged. A.R.S. § 13–1003(A) provides:

"A. A person commits conspiracy if, with the intent to promote or aid the commission of an offense, such person agrees with one or more persons that at least one of them or another person will engage in conduct constituting the offense and one of the parties commits an overt act in furtherance of the offense ...."

Thus, the primary focus of the crime of conspiracy is the agreement itself. *State v. Verive*, 128 Ariz. 570, 627 P.2d 721 (App. 1981). It is unnecessary to prove commission of the substantive crime that is the subject of the conspiracy so long as there is an agreement to commit the offense and an overt act. *State v. O'Brien*, 123 Ariz. 578, 601 P.2d 341 (App.1979). The overt act which is necessary for conspiracy is required as a method of showing that some step has been taken toward executing the illicit agreement. Any action that will corroborate the existence of the agreement and will show that it is being put into effect is sufficient to support the conspiracy charge. *State v. Verive*, supra.

In the instant case, appellees Gessler and Bargar showed Bargar's residence, the situs chosen by them for the transfer and weighing of the marijuana, to undercover agents on October 25, 1982. At the meeting on October 29, all appellees except Jackson met with the agents and conspired to receive delivery of approximately 100 pounds of marijuana. During the course of that meeting, appellee Bargar outlined how and where the transaction was to take place, what functions each person would perform and the chronology of the transfer. The transfer took place later that same day and, although the agents delivered the marijuana to appellees to permit the purchase money to be turned over, control over the marijuana was never relinquished. The overt act which is required for a conspiracy to exist can be any act which naturally advances the intent of the conspiracy. *State v. Stanley*, 123 Ariz. 95, 597 P.2d 998 (App.1979). Thus, the evidence indicates that the crime of conspiracy to possess marijuana for sale was complete as to four of the five appellees prior to the delivery of the marijuana.

 Arizona case law is well settled that entrapment as a matter of law exists when undercover agents supply all of the ingredients of the offense. *State v. Boccelli*, supra. In *Boccelli*, our supreme court quoted the Illinois Supreme Court's ruling in *People v. Strong*, 21 Ill.2d 320, 172 N.E.2d 765 (1961):

" ' * * * While we are sympathetic to the problems of enforcement agencies in controlling the narcotics traffic, and their use of informers to that end, we cannot condone the actions of one acting for the government in supplying the very narcotics that gave rise to the alleged offense. We know of no conviction for sale of narcotics that has been sustained when the narcotics sold were supplied by an agent of the government. This is more than mere inducement. In reality the government is supplying the *sine qua non* of the offense.' " 105 Ariz. at 497, 467 P.2d 740.

In the instant case it cannot be said that the undercover agents supplied all the ingredients of the offense. The distinction between the situations in *Boccelli* and *Strong* and the situation herein is most readily apparent with respect to the nature of the transaction. Here, the undercover agents merely pretended that they were selling marijuana to the appellees. In *Boccelli* and in *Strong* the charges emanated from a "sale" of narcotics wherein the drugs were supplied by undercover agents

and sold to undercover agents. Thus the agents were supplying the sine qua non of the offense, the indispensible condition upon which the offense was predicated. The court in *Boccelli* reversed the conviction since uncontradicted testimony at trial indicated that all of the ingredients of the offense, the plan, marijuana, buyer, purchase money and intent to make the sale, were provided by the state.

Since 1970 the Arizona courts have consistently cited *Boccelli* and its reasoning with approval. *State v. Million*, 120 Ariz. 10, 583 P.2d 897 (1978); *State v. Quinonez*, 119 Ariz. 208, 580 P.2d 346 (1978); *State v. McKinney*, supra; *State v. Mack*, supra. Each of these cases involved a circular transaction in which the narcotics or marijuana sold to one agent were allegedly supplied by another agent. In such situations, when the accused can prove that the substance he sold was both purchased from and sold to agents, and where the defendant was not predisposed to commit such an offense, he has established entrapment as a matter of law and is entitled to acquittal.

Unlike these cases, however, there is no circular nature to the transaction in the instant case. Appellees attempted to purchase the marijuana from the agents for the purpose of selling it to third parties who were not government agents. This case is further distinguishable from *Boccelli* and its progeny in that appellees were charged with conspiracy to possess marijuana for sale and conspiracy to transport the drug, and the alleged offenses were complete without any relinquishment of control over the drugs by the agents. Under the circumstances of this case, we cannot say that the tactics of the agents provided the sine qua non of the offense of conspiracy.

We have at the outset, then, a situation in which the defense of entrapment is less "patently clear" and less "substantial and reasonable" than the defenses in both *Boccelli* and *Strong*. Since the actions of government agents cannot be said to have provided the sine qua non of the offense charged, our inquiry must focus on the intent and predisposition of the appellees.

We note that beginning with the United States Supreme Court case of *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), the defense of entrapment has developed along two distinct theoretical lines. The "subjective" approach to the defense of entrapment, followed by the United States Supreme Court, focuses on the conduct and propensities of the particular defendant in each case and, in the absence of a conclusive showing, permits the jury to determine as a question of fact the defendant's predisposition to commit the crime. *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Sorrells v. United States*, supra.

The "objective" approach adhered to in the concurring opinion of Mr. Justice Roberts, joined by Justices Brandeis and Stone, in the *Sorrells* case, and that of Mr. Justice Frankfurter, joined by Justices Douglas, Harlan, and Brennan, in the *Sherman* case, focuses on "whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power." 356 U.S. at 382.

Appellees contend that our supreme court recognized the Frankfurter-Roberts "objective" approach in *State v. McKinney*, supra; and *State v. Boccelli*, supra. In *State v. Kiser*, 26 Ariz.App. 106, 546 P.2d 831 (1976), however, we stated:

"We do not agree, however, that under *Petralia*, *McKinney* and *Boccelli*, entrapment may be proved as a matter of law solely by reference to the objective character of police conduct. All three cases recognized the rule that entrapment is established where the criminal conduct was the *product* of the creative activity of law enforcement officials, and that there must be activity by such officials in the nature of an *inducement* to commit a crime the accused would not otherwise have committed. We therefore believe that in focusing on police

conduct, the court in *Petralia, McKinney* and *Boccelli* was merely recognizing that the question of whether a defendant was induced to commit a crime against his natural inclinations must be answered in part by examining what the officers actually did in the particular case." 26 Ariz.App. at 110–111, 546 P.2d 831. (Emphasis in original.)

The question of whether the intent to purchase the marijuana originated with appellees as a matter of law must therefore be resolved by considering not only the actions of undercover agents but also appellees' actions. The evidence establishes that appellees attempted to purchase a large quantity of marijuana from undercover narcotics agents. During preliminary negotiations, appellees Gessler and Bargar asked to purchase samples of marijuana from the agents. In the first instance, the agent refused to sell the marijuana but permitted Gessler to take three or four flower tops. In the second instance, the agent also refused to sell any marijuana but told appellee Bargar to "reach in the bag and take whatever you feel comfortable with." Bargar, however, insisted upon trading the agents' sample for some of his "home grown" marijuana.

Appellees contend that any prosecution should be barred absolutely because agents provided these samples. This contention is completely devoid of merit. The Supreme Court stated in *United States v. Russell*, supra:

"... in drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible. For an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something of value to offer them. Law enforcement tactics such as this can hardly be said to violate 'fundamental fairness' ...." 411 U.S. at 433, 93 S.Ct. at 1643.

Although the item of value supplied by the government in *Russell*, the phenyl-2-propanone, was not contraband, the Supreme Court in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) found that "[g]iven the characteristics of phenyl-2-propanone, this is a distinction without a difference ...." 425 U.S. at 493, 96 S.Ct. at 1651. In *Hampton*, a majority of the Court ruled that where the defendant was predisposed to commit the offense, he could not demand acquittal solely on the ground that the contraband was supplied by the government.

Thus, while infiltrating the drug milieu, agents must be permitted to behave in a manner which is consistent with the image they are attempting to portray. Generally, the providing of samples is a routine part of any marijuana transaction. In fact, the practice is so common that it would inevitably arouse suspicion if agents were not permitted to do so. To rule otherwise would subject undercover narcotics agents to the danger of exposure.

Although we may some day be presented with a situation in which the conviction of a predisposed defendant may be reversed because the agents' conduct is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction, the instant case is distinctly not of that genre. The agents' testimony supports the conclusion that appellees needed no persuasion to buy the marijuana from them. This evidence would raise at most a jury question of entrapment.

The trial court made the following findings of fact:

"1. The Court finds no evidence here to support a claim of due process violation because of outrageous government conduct.

2. The Court finds no evidence here to suggest that otherwise innocent persons were induced by agents of the State to commit offenses to which they were not previously disposed.

3. To the contrary, there is considerable evidence to support predisposition

and prior experience by defendants Gessler and Bargar in dealing marijuana." Moreover, appellees Gessler and Bargar indicated that they had been partners in such activity for quite some time. They showed the agents a van with a specially built hidden compartment which they said they used for drug transportation. They also showed the agents a garage which they indicated was used for the unloading and weighing of the marijuana deliveries. In this garage were numerous containers of aviation fuel which appellee Gessler said were used when he and appellee Bargar used airplanes in their drug dealing ventures. This evidence certainly indicates that it was not the government's deception which implanted the criminal design in the minds of appellees, and this is not a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the state from invoking judicial process to obtain a conviction.

We therefore vacate the trial court's order of October 4, 1983, dismissing the indictment against appellees and direct that the charges be reinstated and that the superior court set the case for trial.

BIRDSALL, C.J., and HATHAWAY, J., concur.