**UNITED STATES of America, Plaintiff–Appellee–Cross–Appellant,**

v.

**James Albert McCLELLAND, Defendant–Appellant–Cross–Appellee.**

Nos. 94–30385, 94–30423.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 17, 1995.

Decided Dec. 12, 1995.

718

Kathleen A. Felton, United States Department of Justice, Washington, DC, for plaintiff-appellee-cross-appellant.

Gerald D. Smith, Federal Defenders of Eastern Washington, Spokane, Washington, for defendant-appellant-cross-appellee.

Before: REINHARDT, TROTT, Circuit Judges, and SCHWARZER, District Judge.[*]

REINHARDT, Circuit Judge:

## OVERVIEW

Defendant, James McClelland, was convicted of violating 18 U.S.C. § 1958, Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire. At sentencing the district court granted a downward departure on the ground of imperfect entrapment by the government and sentenced him to sixty months incarceration. Both he and the government have appealed.

McClelland contends that the government engaged in outrageous conduct and that the district judge therefore erred in denying his motion to dismiss the indictment. He also argues that the district judge's denial of his motion for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure was error because he was entrapped by the government. Finally, McClelland asserts that the evidence introduced was insufficient to permit a reasonable jury to conclude that he was guilty of the crime charged. The government appeals the district court's downward departure, which was based on the government's inducement of McClelland. We affirm both the conviction and the sentence.

## FACTS AND PROCEDURAL HISTORY

In December 1993, Marc Russell, who was hired by Defendant James McClelland to work for Combined Insurance Company, moved with his family into McClelland's house. At the time, McClelland had been recently separated from his wife, Marjorie (Margie) McClelland.

In February 1994, McClelland initiated conversations with Russell about harming Margie McClelland. In early March, McClelland told Russell that he wanted his estranged wife killed, and discussed numerous plans for accomplishing that goal, such as poisoning and a drive-by shooting. McClelland drew a map of the area of Kansas where Margie McClelland lived and asked Russell if he could obtain poison. McClelland also told Russell that it would be worth $10,000.00 for Russell to kill her.

On March 13, 1994 Russell contacted Special Agent Mike Sanders of the Vancouver, Washington FBI office, and informed him of the conversations that he had been having with McClelland. The next day, Russell talked to Special Agent Mark Thundercloud of the Spokane FBI office. Thundercloud was about to leave for vacation for a week, so he told Russell to wait until he returned before proceeding any further. On or about March 22, Thundercloud provided Russell, who had agreed to record secretly his con-

[*] Honorable William W. Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

versations with McClelland, with a microcassette recorder so that there could be verification of Russell's story about the murder plot.

On that same day or the next, Russell recorded a conversation with McClelland in which they talked about various previously discussed (but unrecorded) plans for murdering Margie McClelland. On March 24, Russell once again recorded a conversation with McClelland. This time, the two discussed various ways to implement the murder plan, including how Russell would get to Ellis, Kansas.

At numerous points in the March 24th conversation, McClelland displayed reluctance to go through with the plan.

> Russell: My capability is there. Is yours?
>
> McClelland: I don't know.
>
> Russell: A decision.
>
> McClelland: I'm thinking about it, thinking about it and—
>
> Russell: You are running low on time though, though (sic).

Later in the same conversation, Russell again prodded McClelland when he expressed reluctance:

> McClelland: The thing is, that's startin' to bother me is the fact that, I don't know if I—I don't know if I like the idea, that I'm setting myself up as God, heh heh.
>
> Russell: You ask yourself a question, are you?
>
> McClelland: Yeah. And God's more than capable of handling situations and he does it in his own way.
>
> Russell: Do me a favor ... Do me a favor. Stand in the tracks. Just stand there. You know the rest.

Eventually, at Russell's prompting, McClelland gave Russell permission to "go for it".

McClelland and Russell met again the next day. McClelland gave Russell money for the airline tickets, and Russell, following McClelland's instructions, purchased the tickets from a travel agency under a fake name. Russell told McClelland that he had obtained a poison, Risin, which he said causes death in three days. On Saturday, March 26, McClel-

land gave Russell a map of Ellis and explained to Russell the location of Margie McClelland's home and church.

On March 30, the day before he was to leave for Denver, Russell showed McClelland a powdery substance (actually crushed aspirin provided by the FBI) that Russell claimed was the lethal poison. That same day, Russell and McClelland purchased various supplies needed to construct a simple poisoning device consisting of a finger splint with a protruding poisoned tack. McClelland directed Russell in constructing the device and gave him a ring to use to brace it. As part of a backup plan, McClelland also purchased a magnet that Russell was to use to attach a poisoned tack to the handle of Margie McClelland's car. McClelland helped Russell pack and gave him a map of Kansas and a picture of the intended victim.

McClelland drove Russell to Spokane Airport on Thursday, March 31, stopping along the way to buy him a baseball cap to use as a disguise. After Russell arrived in Denver, he called McClelland in the presence of FBI agents and informed him of his location. He again spoke with McClelland at length later that night. In the second conversation, McClelland informed Russell that he was not able to contact Margie McClelland to verify that she would be in Ellis on Sunday.

On April 1, Russell returned to Spokane, but not to McClelland's house. McClelland was arrested on April 4. He waived his *Miranda* rights, and spoke with Agent Thundercloud. He admitted that he knew about the plot to murder Margie McClelland, that he knew that Russell was in Denver so that he could go on to Kansas and kill her, that he had purchased supplies used to make the poisoning device, and that he had given Russell a map of Ellis and shown him where Margie McClelland lived. According to Thundercloud, McClelland also stated that "he was 99 percent sure [Russell] would never be able to carry out the plan, but [that] he wanted him to, and he would not regret it if he did."

McClelland was charged in a one count indictment with causing another to travel in interstate commerce with the intent to com-

mit murder-for-hire in violation of 18 U.S.C. § 1958. At trial, the main evidence consisted of Russell's and Thundercloud's testimony and the recordings of the conversations between Russell and McClelland. The jury returned a guilty verdict.

After the close of the government's case-in-chief, and again after both sides had rested, McClelland made a motion for a judgment of acquittal based on entrapment as a matter of law, or alternatively, dismissal for outrageous government conduct. He then moved for a judgment notwithstanding the verdict under Federal Rule of Criminal Procedure 29 after the jury had returned its verdict. The district court denied the motions.

McClelland also moved the Court for a downward departure in his sentencing on the basis of "imperfect entrapment." The court did depart downward by six levels.

## DISCUSSION

### I. Outrageous Government Conduct

 McClelland contends that the district court erred by not dismissing the indictment because the government conduct was so outrageous that it violated his rights under the due process clause. Whether government conduct is outrageous is an issue of law. On appeal, we review the refusal to dismiss the indictment *de novo*, *United States v. Ahluwalia*, 30 F.3d 1143 (9th Cir.1994); however, we overturn a district court's factual findings, after viewing the evidence in the light most favorable to the government, only if they are clearly erroneous. *United States v. Emmert*, 829 F.2d 805, 810–11 (9th Cir. 1987).

"For a due process dismissal, the Government's conduct must be so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Smith*, 924 F.2d 889, 897 (9th Cir.1991). This is an "extremely high standard" for the defendant to meet. *Id.* The Government may violate the Due Process Clause either by "completely fabricat[ing] the crime solely to secure the defendant's conviction," or by using excessive physical or mental coercion. *United States v. Emmert*, 829 F.2d at 811.[1]

McClelland argues that the government conduct was outrageous for three reasons. First, he says that the government failed to take any steps to corroborate Russell's story or his reliability as an informant. Second, he contends that the government manufactured the offense because it allowed Russell to persuade him to pursue the murder plan despite his reluctance to do so, and because it waited until the element of interstate travel was committed before it arrested him. Finally, he asserts that the government wrongfully failed to take steps to prevent the crime or to protect Margie McClelland from harm.

 McClelland's claims are without merit. The FBI did not rely solely on Russell's reports; Special Agent Thundercloud arranged for Russell to tape his conversations with McClelland. He stated at trial that the reason for doing so was to allow the government "to verify his story that he was telling us at the time." In any event, allegedly poor police work hardly constitutes outrageous government conduct.

 McClelland's contention that the government "manufactured" the crime is without merit. Although Russell did encourage McClelland at various times, that does not constitute manufacturing the crime. Only when "government agents engineer and direct the criminal enterprise from start to finish," does their behavior constitute manu-

---

1. Although cases of improper government coercion are similar to entrapment cases, there are two differences between them. First, "a successful due process defense must be predicated on intolerable government conduct which goes beyond that necessary to sustain an entrapment defense." *U.S. v. Bogart*, 783 F.2d 1428, 1435 (9th Cir.1986) (quoting *United States v. Jannotti*, 673 F.2d 578, 607 (3d Cir.) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982)). Second, a finding that the defendant was predisposed to commit a crime precludes a successful entrapment defense, but not a government coercion claim or any other claim of outrageous government conduct. *See, e.g., United States v. Luttrell*, 889 F.2d 806, 811 (9th Cir.1989), *amended*, 923 F.2d 764 (9th Cir.1991) (en banc), *cert. denied sub nom. Kegley v. United States*, 503 U.S. 959, 112 S.Ct. 1558, 118 L.Ed.2d 207 (1992). When determining whether government conduct was outrageous, the court considers the government's behavior, not the defendant's mental state or predisposition. *Id.*

facturing a crime and violate due process. *United States v. Ramirez,* 710 F.2d 535, 539 (9th Cir.1983); *see also Greene v. United States,* 454 F.2d 783 (9th Cir.1971) (finding outrageous government conduct where government agents set up and sustained a bootlegging operation over a three year period, pressured the defendants to get involved and were the only customer).

The government involvement in this case was not sufficiently extensive to meet the "manufactured the crime" standard. This court has repeatedly concluded that the government did not manufacture a crime in cases in which its actions were more aggressive than they were here. For example, in *United States v. Garza–Juarez,* 992 F.2d 896, 905 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994), the Court found no due process violation although the government "initiated all contacts [with the defendants], raised the subject of illegal firearms and offered to supply the materials." *See also United States v. Citro,* 842 F.2d 1149, 1153 (9th Cir.) (finding that the Government did not "create the criminal activity" even though it originally proposed the illegal scheme and supplied the counterfeit credit cards), *cert. denied,* 488 U.S. 866, 109 S.Ct. 170, 102 L.Ed.2d 140 (1988).

Finally, because the government knew that Russell had no intention of killing McClelland's estranged wife, there was no need for it to protect her.

McClelland has a heavy burden to meet in order to show that the government conduct was sufficiently outrageous to constitute a due process violation. *See United States v. Simtob,* 901 F.2d 799, 809 (9th Cir.1990) (Government acts that were "sometimes reprehensible" did not violate due process). He falls far short of doing so.

## II. Entrapment

McClelland contends that he was entrapped. He argues that the district court erred in denying his motion for acquittal because the evidence was insufficient to show that he was predisposed to commit the crime.

■■■ "A defense of entrapment has two elements: government inducement of the crime and the absence of predisposition on the part of the defendant." *United States v. Skarie,* 971 F.2d 317, 320 (9th Cir.1992).[2] If the defendant is found to be predisposed to commit a crime, an entrapment defense is unavailable regardless of the inducement. *United States v. Smith,* 924 F.2d 889, 898 (9th Cir.1991). Predisposition is established only after analyzing five factors: 1) the character and reputation of the defendant; 2) whether the government made the initial suggestion of criminal activity; 3) whether the defendant engaged in the activity for profit; 4) whether the defendant showed any reluctance; and 5) the nature of the government's inducement. *Citro,* 842 F.2d at 1152. Although none of these factors is controlling, the defendant's reluctance to engage in the criminal activity is the most important. *Id.*

■■■ McClelland's primary contention is that "[t]he only evidence to show that Mr. McClelland was predisposed to commit the crime ... was from Russell. The evidence showed Russell to be ... an unreliable witness." McClelland's argument fails for two reasons. First, the jury, which was presented a fair amount of evidence as to Russell's credibility or lack thereof, was entitled to believe Russell and apparently did. Furthermore, the jury heard taped conversations that contained evidence from which it could have inferred that McClelland was predisposed to commit the crime.

In considering the five factors relevant to predisposition, there was sufficient evidence introduced at trial, viewed in the light most

2. "Where the government has induced an individual to break the law and the defense of entrapment is at issue, the prosecution must prove beyond a reasonable doubt that the defendant was predisposed to commit the crime prior to first being approached by government agents." *United States v. Davis,* 36 F.3d 1424, 1430 (9th Cir.1994) (citing *Jacobson v. United States,* 503 U.S. 540, 548–49, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992)), *cert. denied,* —— U.S. ——, 115 S.Ct. 1147, 130 L.Ed.2d 1106 (1995). The government does not dispute the district court's finding of inducement, but rather argues that the evidence was sufficient to support a finding of predisposition on McClelland's part.

favorable to the government, to allow a reasonable jury to find beyond a reasonable doubt that McClelland was predisposed to commit the crime.

On the first factor, good character and reputation, McClelland did present some undisputed evidence as to his lack of predisposition. Character witness Ronald Urban stated that in his opinion, McClelland was an "absolutely not violent," law-abiding citizen. This factor weighs slightly in McClelland's favor.

There is uncontradicted evidence that McClelland made the initial suggestion of criminal activity. Russell stated that prior to his notifying the FBI, McClelland approached him with plans to murder his estranged wife, prepared a map for him, asked him to secure poison, and offered him $10,000.00 to kill her. Thus, the second factor weighs in favor of the government.

Despite the fact that McClelland sometimes displayed reluctance to go through with the plan, ("I don't know if I—I don't know if I even like the idea, that I'm setting myself up as God ..."),[3] the jury could well have concluded that his reluctance was not sufficiently strong to warrant a favorable finding on the third factor. At all times McClelland participated actively in the planning of his wife's murder. Moreover, his reluctance was, at most, Hamlet-like. He equivocated and waffled and hesitated. Under the circumstances, viewing the evidence in the light most favorable to the prosecution, this factor, the most important one, also favors the government. *See Davis*, 36 F.3d at 1430.

There is evidence in the record from which the jury could have concluded that McClelland would benefit financially from the killing. Thundercloud testified that McClelland talked about the possibility of having to pay legal fees and alimony if McClelland and his wife had divorced. A reasonable jury thus

could have found that factor four, like factors two and three, favored the government.

Analysis of the fifth factor—the nature of the inducements—is the most difficult. There was ample evidence that whenever McClelland displayed hesitation or doubt, Russell would push him. (Russell: "I need a decision.... If things aren't arranged today ... most likely it won't be done.") (Russell: "... Make a damn decision.... There's no more talking about it. There's no more. We've hashed it out. We've done everything. You just gotta make the decision."). Russell also took steps to increase the chances that McClelland would in fact decide to kill Margie. For example, he proposed to take deferred payment so that McClelland could afford to hire him. Nor did Russell ever do anything to discourage McClelland. McClelland, in the midst of marital problems, was, as noted by the court below, "emotionally debilitated", and the record supports the district court's conclusion that Russell "preyed upon [McClelland's] vulnerability and ultimately encouraged [him] to commit the crime in question."

The pressure employed by Russell was more serious than mere solicitation, and it was quite frequent. On the other hand, prodding a defendant to make up his mind is not as severe as threats or offering cash incentives. *Cf. Garza–Juarez*, 992 F.2d at 909 (noting that the government agent did not employ threat or cash incentives. "Suggestions and solicitations do not appear to constitute the sort of inducement that satisfies this element of the entrapment defense."). On balance, we conclude that it is a close call whether the government carried its burden with respect to this factor.

Because there was sufficient evidence to support findings against McClelland as to three of the five factors for determining predisposition (the second, third, and fourth factors), and because one of those three (the third) was the most important factor, the

---

**3.** One of the secretly taped conversations not only demonstrates the reluctance shown by McClelland, but also serves as an example of the pressure and inducement continually exercised by Russell:

Russell: My capability is there. Is yours?

McClelland: I don't know.
Russell: A decision.
McClelland: I'm thinking about it, thinking about it and—
Russell: You are running low on time, though ...

jury properly could have found that McClelland was predisposed to participate in the murder plot. Thus, the district court did not err in denying McClelland's motion, based on his allegation that he was entrapped as a matter of law, for judgment of acquittal.

### III. Sufficiency of the Evidence

 McClelland contends that the evidence was insufficient to support a finding that he acted knowingly and intentionally to cause Russell to travel interstate with the intention of killing Margie McClelland. The court affirms if, viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vgeri*, 51 F.3d 876, 879 (9th Cir.1995).

McClelland's argument merits little consideration because there was more than ample evidence in the record from which a rational jury could have found him guilty beyond a reasonable doubt. According to Russell, McClelland initiated conversations about harming his wife and about killing her. He also drew a detailed map for Russell, asked him if he could "obtain some poison," and offered him $10,000 to commit the murder. The jury heard tapes on which McClelland gave Russell money with instructions to buy airline tickets to Denver under a false name, and provided him with maps and a description of where his wife lived.

The jury also heard the following tape recorded conversation between Russell, who was in Denver, and McClelland:

McClelland: ... [Y]ou would need to kinda make sure you kind of follow her out to the field and use Plan B or C?

Russell: Plan C. Okay.

McClelland: With that stun [gun].

Russell: All right, all right. And after I stun her exactly what did you need—exactly what did you want after she was stunned?

McClelland: I'd I'd (sic) give her a nice good shot with that stuff.

Russell: Oh, the poison?

McClelland: Hm-hmm.

Russell: Oh-h, okay. All right. I thought it was the slitting of the wrists but no—

McClelland: No.

Russell: You want me to stun her and then then do the poison.

McClelland: Uh-hmm.

McClelland's principal argument is that Russell's testimony was incredible, and that the "plans" to kill Margie McClelland were so fantastic, that a rational jury could not have found that McClelland knowingly intended them to happen. The argument is wholly unpersuasive. Although McClelland sets forth legitimate grounds on which a jury could have questioned the credibility of Russell's testimony, "questions of credibility are for the jury to decide and are generally immune from appellate review." *United States v. Hodges*, 770 F.2d 1475, 1478 (9th Cir.1985). In addition, much of the testimony from which the jury could have found that McClelland intended Russell to travel from Washington to Kansas to kill Margie McClelland consisted of McClelland's own words heard on audiotapes by the jury. A rational jury could easily have found all the elements of the offense beyond a reasonable doubt.

### IV. Downward Departure

The government challenges the district court's decision to grant a downward departure on the ground of imperfect entrapment. The court first determined that a downward departure was warranted and that six levels was the appropriate amount; it then set McClelland's offense level at 25 and his criminal history category at I. The applicable guideline range was 57 to 71 months, and the court sentenced him to 60 months incarceration.

We first considered whether the government's encouragement of a defendant to commit a crime might justify a downward departure in *United States v. Dickey*, 924 F.2d 836 (9th Cir.1991). We noted that only the Eighth Circuit, in *United States v. Streeter*, 907 F.2d 781 (8th Cir.1990), *rev'd on other grounds*, *U.S. v. Wise*, 976 F.2d 393 (8th Cir.1992), had addressed the question. We held that "*at least where a defendant pleads guilty to an offense*, '[w]e see no warrant for

the argument that governmental ... misconduct should mitigate the sentence of an admittedly guilty defendant.'" *Dickey,* 924 F.2d at 839 (quoting *Streeter,* 907 F.2d at 787) (emphasis added).

Three years later in *United States v. Garza–Juarez,* 992 F.2d 896 (9th Cir.1991), we affirmed a downward departure based on the district court's finding that the government had engaged in aggressive encouragement that did not rise to the level of entrapment.[4] We found that aggressive encouragement of wrongdoing "may be used as a basis for departure under section 5K2.12" even when the government conduct is not so serious as to meet the criteria for that legal defense. *Id.* at 912. We referred to *Dickey* and stated that it had only foreclosed imperfect entrapment as a basis for departure *where the defendant had pled guilty. Id.* at 912 n. 1.

In subsequent cases, we have cited *Garza–Juarez* for the proposition that imperfect entrapment can be a ground for downward departure. *See United States v. Staufer,* 38 F.3d 1103, 1106 (9th Cir.1994) ("[T]he Ninth Circuit has recognized that government conduct of an entrapping nature may warrant a downward departure."); *United States v. Ulysses–Salazar,* 28 F.3d 932, 938 (9th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1367, 131 L.Ed.2d 223 (1995); *United States v. Pacheco–Osuna,* 23 F.3d 269, 272 (9th Cir.1994). This proposition was not essential to the holding of any of these cases; nevertheless, all accepted the holding of *Garza–Juarez.*

■ The government concedes that our precedent holds that an imperfect entrapment defense may constitute a ground for departure. However, the government argues that the district court did not have the legal authority to depart here because *Garza–Juarez* and the other Ninth Circuit cases cited above are inapposite where the defendant, rather than the government, *initiated* the criminal activity, and the government only encouraged a defendant who was

already predisposed to commit a crime. We disagree.

■ There are a number of serious flaws in the government's argument. It appears that the government is contending that a defendant who was predisposed to commit a crime is not entitled to a departure. This position reflects a fundamental misunderstanding of the difference between imperfect entrapment as a ground for downward departure and entrapment as a legal defense. If the jury finds that a defendant who raises an entrapment defense was *not* predisposed to commit the crime, it would be obliged to find that he was not guilty. Conversely, if the jury convicts a defendant who has raised an entrapment defense, then it has necessarily found him to be predisposed to commit the crime. Since everyone convicted of a crime despite the assertion of an entrapment defense has been found to be predisposed, under the government's theory no one could ever receive a downward departure based on imperfect entrapment. It is precisely those defendants who *are* predisposed but who are then pressured unduly by the government to go forward with the offense who are eligible to assert imperfect entrapment.

■ There is also no merit to the government's argument that we limit imperfect entrapment departures to cases in which the government first proposes the illegal activity because such a rule would also be inconsistent with the basic entrapment law. Even if a defendant first approached the government, he may have a defense of entrapment. That is true because, as we noted earlier, when considering an entrapment defense, there are five factors that the jury considers in making a determination on predisposition. Only one of those factors concerns whether the defendant approached the government first, and that factor is not even the most important. *See United States v. Citro,* 842 F.2d 1149, 1152 (9th Cir.1988) (stating that of the five factors to consider as to predisposition, the most important is the defendant's

4. We cited U.S.S.G. § 5K2.12 (policy statement), which reads in pertinent part:
 If the defendant committed the offense because of serious coercion, blackmail or duress, under

circumstances not amounting to a complete defense, the court may decrease the sentence below the applicable guideline range.

reluctance). It would defy logic for us to hold that although defendants who approach the government first may have a complete entrapment defense to a crime, they are foreclosed as a matter of law from asserting imperfect entrapment, a lesser form of that defense.[5]

 Finally, the government mistakenly contends that "[a] downward departure based on the government's encouragement of a predisposed defendant to continue with criminal activity initiated by the defendant serves only to deter government misconduct, a purpose having no relation to goals of the Sentencing Reform Act." In fact, evidence of imperfect entrapment, like evidence of imperfect coercion, is in some cases a legitimate ground for departure, because it may show that the defendant is "both less morally blameworthy than an enthusiastic [defendant] and less likely to commit other crimes if not incarcerated." *See Garza–Juarez*, 992 F.2d at 913 n. 1 (quoting with approval *Dickey*, 924 F.2d at 840 (Reinhardt, J., dissenting)). A district court could properly determine that a defendant who first proposed an illegal scheme, but who later expressed serious reservations and acted only after strong and repeated inducements by the government is less morally blameworthy and less likely to commit crimes in the future than a defendant who eagerly participated in an illegal scheme with no inducement other than the initial suggestion by a government agent. Thus, if a district court departs downward on the ground of imperfect entrapment in a case in which the defendant first approached the government, the departure may still be completely consistent with at least two important

factors relevant to sentencing—protection of the public, and characteristics particular to the defendant's culpability. *See Pacheco-Osuna*, 23 F.3d at 271–72; *Garza–Juarez*, 992 F.2d at 913 n. 1.[6] Accordingly, we reject the government's argument *in toto* and hold that there was a legitimate legal basis for the district court's downward departure under 18 U.S.C. § 3553(b).

Both the conviction and the sentence are

AFFIRMED.

---

5. In deciding whether a departure is warranted on the ground of imperfect entrapment, the amount of inducement, the level of reluctance on the defendant's part, and who acted first should *all* be relevant factors for the district court to weigh, just as they are in cases in which entrapment is a complete defense. Contrary to the government's position, the question of who acted first is not determinative whether entrapment is asserted as a defense to the charges or imperfect entrapment is asserted as a grounds for a downward departure.

6. The district court found that there was clear and abundant evidence that Russell, an agent of the government, induced McClelland to commit the crime. The district court pointed to McClel-

land's vulnerable emotional state, his repeated expressions of reluctance, and Russell's frequent efforts to prod and encourage McClelland whenever McClelland expressed hesitation. The government has not explicitly challenged these findings. In any event, we note that there is sufficient evidence in the record to support them. The court made a reasonable inference that McClelland, who was in the midst of a divorce and custody battle, was emotionally vulnerable and susceptible to Russell's influence. The record shows that although McClelland initiated the idea of killing his wife, Russell repeatedly pushed McClelland to go forward, even when he expressed reluctance.