IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee*,

*v.*

CRAIG A. WILLIAMSON,
*Appellant*.

No. 2 CA-CR 2013-0566
Filed February 3, 2015

---

Appeal from the Superior Court in Pima County
No. CR20121779004
The Honorable Paul E. Tang, Judge

**AFFIRMED**

---

COUNSEL

Mark Brnovich, Arizona Attorney General
Joseph T. Maziarz, Section Chief Counsel, Phoenix
By Amy Pignatella Cain, Assistant Attorney General, Tucson
*Counsel for Appellee*

The Law Offices of Stephanie K. Bond, P.C., Tucson
By Stephanie K. Bond
*Counsel for Appellant*

_____

**OPINION**

_____

Judge Vásquez authored the opinion of the Court, in which Presiding Judge Kelly and Judge Howard concurred.

_____

V Á S Q U E Z, Judge:

**¶1**         After a jury trial, Craig Williamson was convicted of various conspiracy charges for his participation in a plan to commit a home invasion robbery to steal drugs.  The trial court found he had two or more historical prior felony convictions and sentenced him to presumptive, concurrent terms of imprisonment totaling 15.75 years.  On appeal, Williamson argues the court erred by denying his motions:  (1) to dismiss for outrageous government conduct; (2) for a mistrial when a police officer gave an opinion on an ultimate issue while testifying at trial; (3) for a jury instruction concerning the state's destruction of evidence; and, (4) for a judgment of acquittal and a new trial.  He also argues the court erred when it required him to stipulate to the elements of the offenses in order to receive a jury instruction on the affirmative defense of entrapment.  For the following reasons, we affirm the convictions and sentences.

**Factual and Procedural Background**

**¶2**         We view the evidence presented at trial in the light most favorable to sustaining the convictions and resolve all reasonable inferences against Williamson.  *See State v. Snider*, 233 Ariz. 243, ¶ 2, 311 P.3d 656, 658 (App. 2013).  In April 2012, Tucson police officers Miguel Verdugo and Brandon Angulo were working undercover with the Special Investigations Division, Street Crimes Interdiction Unit.   Both officers had worked with M.C., a confidential informant who informed Angulo "there was a home invasion crew lined up to go to work."   The officers asked the informant to set up a meeting for which they would use a "back story" they had devised:  Verdugo, using the name "Emilio," would be introduced as the nephew of a Mexican narcotics trafficker and Angulo, using the name "Julian," as Verdugo's cousin.  The persons

under investigation would be told that Verdugo and Angulo traffic cocaine from Mexico and distribute it in Arizona but, because Verdugo was "dissatisfied with [his] role in th[e] enterprise," both men wanted to "rip off [Verdugo's] uncle" by stealing drugs from a stash house.

¶3        On April 11, 2012, the informant introduced the officers to Williamson's brother, Chris, in the parking lot of an apartment complex.[1]  Chris told the officers he was "[r]eady to do some work." When he stated "he had done burglaries before," "Angulo made it very clear to him that there wasn't going to be a burglary."  Angulo stated "that it would be basically a robbery of a stash of drugs and that people would be guarding it and that people would be armed." The officers and Chris agreed to meet later to "discuss things."

¶4        On April 13, the officers met Williamson, Chris, and Randy Chapman at a restaurant.  During that meeting, the officers said there were as many "as 40 kilos" of cocaine they wanted the defendants to steal from a drug stash house guarded by two men with assault rifles and another man "possibly with a handgun." Williamson told the officers he had committed other home invasions and stated he had a shotgun "he was ready to use" and he had a "cattle prod that he intended to use during the home invasion." Williamson also "requested that [the officers] give him some firearms."

¶5        When the officers asked Williamson and the others what they expected as payment for the home invasion, they said they wanted half.  And, "if they got 20 kilos of cocaine, they wanted to cash out ten of it for cash.  So if they had ten kilos for 19,000, that would be $190,000 that they wanted to get cashed out and keep the

_____

[1]During that meeting, and all of the subsequent meetings with the defendants, one of the officers wore a concealed camera that also captured the audio portions of the conversations.  The recordings were played for the jury to supplement the testimony of various witnesses, and the recordings and transcripts were admitted into evidence.

additional ten kilos of cocaine for themselves." Angulo told the defendants that if they wanted to walk away, they could do so. All of them responded that "they're in." At the next meeting on April 17, the Williamson brothers and Chapman introduced the officers to the fourth co-conspirator, Preston Adams, and Angulo explained the details of the home invasion to him.

¶6        On the afternoon of May 2, the officers met the Williamson brothers in a grocery store parking lot to give them $60. They had requested the money to buy masks, gloves, pepper spray, and plastic zip ties for the home invasion. The final meeting between the officers and all four defendants took place later that evening in the parking lot of a shopping mall. Verdugo and Angulo drove to the meeting in separate undercover vehicles, one of which would be provided to the defendants for the home invasion. The officers opened the trunk of one of the vehicles and showed Williamson and the others four assault rifles and four ballistic vests inside a duffel bag. Two defendants removed the duffel bag from the trunk and the defendants "start[ed] to divide up the rifles and the ballistic vests amongst themselves." "Williamson was also putting on rubber gloves at that time." Verdugo and Angulo drove away, and a SWAT team immediately moved in and took the defendants into custody. During a search of the vehicle, Williamson and the others had driven to the meeting, officers found pepper spray, masks, rubber gloves, and plastic zip ties.

¶7        A grand jury indicted Williamson for conspiracy to commit: kidnapping, armed robbery, aggravated robbery, and possession of a narcotic drug. Williamson was convicted of the charges and sentenced as described above. This appeal followed. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

**Outrageous Government Conduct**

¶8        Williamson argues the trial court erred when it denied his motion to dismiss based on outrageous government conduct. He maintains "the State's extensive involvement in dreaming up this fictitious scheme—including the arbitrary amount of drugs and

illusory need for weapons and extra associates—transcends the bounds of due process." We generally review a trial court's ruling on a motion to dismiss criminal charges for an abuse of discretion, but review constitutional issues de novo. *State v. Rosengren*, 199 Ariz. 112, ¶ 9, 14 P.3d 303, 306-07 (App. 2000); *see also United States v. Garza-Juarez*, 992 F.2d 896, 903 (9th Cir. 1993) (district court's decision on due process claims reviewed de novo). "We defer to the trial court's factual findings that are supported by the record and not clearly erroneous." *Rosengren*, 199 Ariz. 112, ¶ 9, 14 P.3d at 307.

**¶9** The outrageous government conduct defense first was recognized by the United States Supreme Court in *United States v. Russell*, 411 U.S. 423 (1973). There, the Court speculated that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431-32. The Court stated that the government's conduct must be so egregious that it violates notions of "'fundamental fairness'" and is "'shocking to the universal sense of justice.'" *Id.* at 432, *quoting Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960). But, although the Court has recognized the defense, to date, it has not reversed a conviction on the basis of outrageous government conduct. And, we are aware of only two reported cases in which federal appellate courts have granted relief on that basis. *See United States v. Twigg*, 588 F.2d 373, 382 (3d Cir. 1978); *Greene v. United States*, 454 F.2d 783, 787 (9th Cir. 1971).

**¶10** Although a claim of outrageous government conduct and the defense of entrapment are similar in some respects, they are legally distinct. The former is grounded in due process principles and is resolved by the trial court as a matter of law before trial. *United States v. Mosley*, 965 F.2d 906, 908-09 & 909 n.3 (10th Cir. 1992). In contrast, the latter is based upon public policy considerations and is determined by the trier of fact in light of the evidence presented at trial. *State v. Preston*, 197 Ariz. 461, ¶¶ 5, 8, 4 P.3d 1004, 1007-08 (App. 2000). Additionally, the entrapment defense focuses on whether the defendant was predisposed to commit the crime, whereas a claim of outrageous government

conduct focuses on the government's conduct. *Mosley*, 965 F.2d at 909.

¶11     To establish a claim of outrageous government conduct, a defendant must show either: (1) the government "'engineer[ed] and direct[ed] a criminal enterprise from start to finish,'" *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008), *quoting United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003), or (2) the government used "excessive physical or mental coercion" to induce the defendant to commit the crime, *United States v. McClelland*, 72 F.3d 717, 721 (9th Cir. 1995). The defense is "often raised but is almost never successful." *United States v. Gamble*, 737 F.2d 853, 857 (10th Cir. 1984). "[I]t is not outrageous for the government to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity." *Mosley*, 965 F.2d at 911. In inducing a defendant to repeat or expand his criminal activity, it is not improper for the government to suggest the illegal activity and provide supplies and expertise. *Id.* at 911-12. And, "coercion of any type must be particularly egregious before it will sustain an outrageous conduct defense." *Id.* at 912. "'[G]overnment agents may employ appropriate artifice and deception in their investigation,'" "make 'excessive offers,'" and "even utilize 'threats or intimidation [if not] exceeding permissible bounds.'" *Id.*, *quoting United States v. Lambinus*, 747 F.2d 592, 595 (10th Cir. 1984), *and United States v. Biswell*, 700 F.2d 1310, 1314 (10th Cir. 1983) (alterations in *Mosley*). "In short, a defendant must meet an extremely high standard." *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991).

¶12     There is no single test for resolving a claim of outrageous government conduct. "Rather, the inquiry appears to revolve around the totality of the circumstances in any given case." *Mosley*, 965 F.2d at 910. Here, in denying Williamson's motion to dismiss, the trial court applied the factors identified in *United States v. Black*, 733 F.3d 294, 303 (9th Cir. 2013), that previous cases have considered "relevant to whether the government's conduct was outrageous." The factors are as follows:

> (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

*Id.* at 303.

**¶13**　　　In *Black*, as in this case, the defendants' convictions arose from a sting operation in which an undercover agent utilized a confidential informant to recruit the defendants to commit an armed robbery of a fictitious drug stash house. *Id.* at 297-98. On appeal, the court noted that "[t]he reverse sting employed here largely falls within the bounds of law enforcement tactics that have been held reasonable." *Id.* at 302. However, the court stated it was troubled by two aspects of the particular sting operation. First, the operation was based on a fiction, created and staged by the government. *Id.* at 302-03. Second, the government did not "infiltrat[e] a suspected crew of home invasion robbers, or seduc[e] persons known to have actually engaged in such criminal behavior." *Id.* at 303. Rather, the government targeted "places defined only by economic and social conditions" to recruit "persons vulnerable to such a ploy who would not otherwise have thought of doing such a robbery." *Id.* But after applying the factors, the court stated its "concerns [we]re mitigated to a large degree" because the defendants told the agent they had "engaged in similar criminal activity in the past," "they joined the conspiracy without any great inducement or pressure from the government," and "there [wa]s no significant evidence of government overreaching or coercion." *Id.* at 307-08. The court thus concluded it was "satisfied the government did not cross the line." *Id.* at 310. We reach the same conclusion in this case.

¶14 Because the two cases are factually similar, we begin by addressing the two concerns expressed by the court in *Black* — the crimes of conviction were created and staged by the government, and the government did not target known or suspected offenders, but, instead, went "trolling" for persons who, because of their vulnerable socio-economic status, might be willing to commit offenses they otherwise would not commit. *Id.* at 302-03.

¶15 As to the first concern, we are not aware of any sting operation that does not involve some degree of fiction, planning, and staging by the government. *See, e.g., State v. Ottar*, 232 Ariz. 97, ¶ 1, 302 P.3d 622, 624 (2013) (affirming drug possession conviction where defendant bought drugs in a reverse sting operation even though defendant "d[id] not and would not have been allowed to take them away"). We have found several cases that suggest sting operations involving fictional drug stash house robberies are a fairly common police practice, and courts consistently have found the practice does not constitute outrageous conduct. *See United States v. Corson*, 579 F.3d 804, 806 (7th Cir. 2009) (affirming conviction for conspiracy to traffic drugs where there "never was any stash house to rob"); *United States v. Williams*, 547 F.3d 1187, 1201 (9th Cir. 2008) ("The government's decision to use a sting operation to apprehend this group of criminals reduced the risk of violence to the public and is to be commended, not condemned. Though perhaps creative, the government's sting does not violate the universal sense of justice."); *United States v. Rodriguez*, 360 F.3d 949, 952, 960 (9th Cir. 2004) (affirming conviction where defendants agreed to raid a fictitious drug stash house); *United States v. Sanchez*, 138 F.3d 1410, 1413-14 (11th Cir. 1998) (finding no outrageous conduct where government created plan to rob a "non-existent" drug stash house). Thus, we conclude the fictional "back story" used by the officers in this case does not rise to the level of outrageous conduct.

¶16 Regarding the second concern expressed by the court in *Black*, we agree with the trial court that "[t]here is no evidence in this [case] that [the government] similarly targeted individuals of a specific social economic population." As the trial court noted, the informant was a roommate of Williamson's brother. Thus, there is no evidence that the officers or the informant found Williamson by

"trolling for targets" as was the case in *Black*, 733 F.3d at 303. To the extent Williamson was recruited, he was recruited by his brother, who introduced him to the officers at the second meeting.

¶17 We next consider the six factors *Black* identified "as relevant to whether the government's conduct was outrageous." *Id.* The factors "do not constitute a formalistic checklist, but help focus our analysis of the totality of circumstances." *Id.* at 304.

**A. Known Criminal Characteristics and Individualized Suspicion.**

¶18 Here, regarding the first two factors, the officers neither had knowledge of Williamson's criminal background, nor did they suspect him of being involved in home invasion robberies before conducting their undercover investigation. But, even though the officers lacked any direct knowledge or suspicion of Williamson, they initiated their sting operation only after the informant told them "there was a home invasion crew lined up to go to work."

¶19 Thus, unlike the situation in *Black*, the officers in this case did not "recruit [the defendants] from a more generalized population." 733 F.3d at 307. Rather, they "focused on a category of persons [they] had reason to believe were involved in the type of illegal conduct being investigated." *Id.* at 304. For example, in *United States v. Garza-Juarez*, the government initiated an undercover investigation after an undercover agent received a tip that an unidentified Hispanic male had illegally sold an assault-type firearm at a swap meet. 992 F.2d 896, 899 (9th Cir. 1993). The agent went to the swap meet looking for Hispanic males who were selling guns and lured the defendant into a sale of illegal weapons and suppressors when it appeared he was selling more firearms than would be expected of someone selling a "personal collection." *Id.* at 899-900. On appeal, the court affirmed the defendant's convictions, rejecting his argument that the "government's outrageous conduct consisted of targeting him for an investigation without any reason to suspect he was engaged in illegal conduct." *Id.* at 904. The court relied on *United States v. Luttrell*, 923 F.2d 764, 764 (9th Cir. 1991), in which it held due process does not require reasonable suspicion of a particular individual before the government conducts an

investigation. *Garza-Juarez*, 992 F.2d at 904. We conclude the first two factors do not support a claim of outrageous conduct.

## B. Government's Role in Creating and Encouraging the Crimes.

¶20      The third factor—the government's role in creating the crimes of conviction—focuses on whether the "government approached the defendant initially or the defendant approached a government agent, and whether the government proposed the criminal enterprise or merely attached itself to one that was already established and ongoing." *Black*, 733 F.3d at 305. In this case, it is undisputed that the officers initiated the contact with the defendants by asking the informant to set up a meeting. However, it was Williamson's brother who recruited Williamson to participate in the plan, not the officers or the informant. *See id.* at 307. Indeed, Williamson acknowledges the informant "never spoke with [him] about doing a home invasion." Although Williamson claims the officers "told Chris Williamson to get a crew together," they did not tell him whom to recruit.

¶21      We do agree with Williamson, however, that the fictitious robbery of a drug stash house originated entirely with the officers. But again, this is mitigated by the information they had received from the informant that "there was a home invasion crew lined up to go to work." Additionally, although "the government created the proposed crime, initiated contact with the defendants[,] . . . and set the bait," Williamson told the officers he had committed other home invasion robberies in the past. Just as the court did in *Black*, we find it significant that Williamson's statement to the officers was "recorded on tape." *Id.* at 307 (defendant told officers he "had engaged in similar criminal activity in the past, in [a] conversation[] that w[as] recorded on tape."). Williamson claims "there is no evidence that [he] actually committed a previous home invasion." To the extent he suggests the officers had a duty to verify his statement, we reject this argument. *Cf. State v. Lacey*, 143 Ariz. 507, 511-12, 694 P.2d 795, 799-800 (App. 1984) (informant's testimony that defendant admitted engaging in prior narcotics transactions admissible without additional proof; defense of entrapment puts predisposition in issue). The evidence established that Williamson

was "eager to commit the fictional stash house robbery, and [he] joined the conspiracy without any . . . inducement or pressure from the government." *Black*, 733 F.3d at 307.

¶22        This brings us to the fourth *Black* factor, which examines "[t]he extent to which the government encouraged a defendant to participate in the charged conduct[,] . . . with mere encouragement being of a lesser concern than pressure or coercion." *Id.* at 308.  In this case, there is no evidence that the officers encouraged or coerced Williamson to commit the offenses.  Indeed, the officers told the defendants on numerous occasions they could "walk away" from the plan at any time.  Williamson concedes there is "no indication that the [officers or the informant] threatened or otherwise coerced [him] to enter into the conspiracy" but he contends "the economic coercion inherent in this case should be considered."  He argues the officers "targeted people who are unemployed and have distorted moral compasses" and promised him more money than he had seen in his life.

¶23        As part of the "back story," the officers told the defendants there were as many as forty kilograms of cocaine at the stash house with an approximate value of $19,000 per kilogram.  But promising the defendants a considerable profit does not rise to the level of outrageous conduct.  *See, e.g.*, *United States v. Emmert*, 829 F.2d 805, 811-12 (9th Cir. 1987) (informant's offer of $200,000 "finder's fee" to college student in return for supplying cocaine did not constitute outrageous conduct); *United States v. Martinez*, 749 F.2d 601, 603-04, 605 (10th Cir. 1984) (not outrageous to offer food stamps to poverty-level defendant at forty percent of face value).  Moreover, the defendants set their own price when the officers asked what they expected as payment for the home invasion.  We therefore reject Williamson's "economic coercion" argument.  "[C]oercion of any type must be particularly egregious before it will sustain an outrageous conduct defense."  *Mosley*, 965 F.2d at 912.  In *State v. Walker*, this court stated "investigatory conduct violates a defendant's due process rights only when it approaches 'coercion, violence, or brutality to the person.'"  185 Ariz. 228, 239, 914 P.2d 1320, 1331 (App. 1995), *quoting Irvine v. California*, 347 U.S. 128, 133 (1954) (alteration in *Walker*).

## C. Nature of Government's Participation, Nature of Crimes, and Necessity for Government's Actions.

¶24　　　The fifth and sixth factors address the extent to which the government participated in the offenses and the need for the particular "investigative technique" given the nature of the crimes being investigated. *Black*, 733 F.3d at 308-09. Here, the officers provided the "back story" but, contrary to Williamson's argument, they did not provide "the directions about how to perform the robbery." The officers also provided guns, ballistic vests, and a vehicle to be used in the home invasion. However, the evidence established that they provided the guns at Williamson's request. Verdugo also testified the officers provided the guns and vehicle for safety reasons. The guns were altered so they could not fire, and the vehicle had a remote engine kill switch to prevent the defendants from driving away.

¶25　　　Williamson further argues the officers provided the money that he and his brother used "to buy the supplies" for the home invasion. The officers gave Williamson $60 to buy supplies, but the evidence established they did so only after the defendants requested money for that purpose. And contrary to Williamson's suggestion, the officers did not tell the defendants which supplies to buy. When Williamson and the others were arrested at the staging area for the home invasion, they had in their possession pepper spray, knives, masks, rubber gloves, and plastic zip ties to be used for restraints. We conclude the government's participation in the crimes does not rise to the level of outrageous conduct.

¶26　　　Finally, the sixth factor "consider[s] the need for the investigative technique that was used in light of the challenges of investigating and prosecuting the type of crime being investigated." *Black*, 733 F.3d at 309. We conclude the court's findings in *Black* concerning this factor are no less applicable in this case. "[S]tash house robberies are largely unreported crimes that pose a great risk of violence in residential communities." *Id*. "The reverse sting tactic was designed to avoid these risks to the public and law enforcement officers by creating a controlled scenario that unfolds enough to capture persons willing to commit such an armed robbery without

taking the final step of an actual home invasion." *Id*. We therefore agree with the trial court's finding "under a totality of the circumstances test" that the officers' investigation in this case does not constitute outrageous government conduct.

**Motion for Mistrial**

¶27 Williamson next argues the trial court abused its discretion in denying his motion for a mistrial after a police officer "testified to the ultimate issue of entrapment." We review a trial court's denial of a motion for a mistrial for an abuse of discretion. *State v. Miller*, 234 Ariz. 31, ¶ 23, 316 P.3d 1219, 1228 (2013).

¶28 During Verdugo's direct examination, the prosecutor played portions of the audio and video recordings of the officers' meetings with Williamson and his co-conspirators. The prosecutor periodically stopped the recording and asked Verdugo to explain to the jury what they had just seen and heard. At one point, the prosecutor asked Verdugo why it was important for undercover officers to say repeatedly to the persons targeted in an investigation: "[I]f you want to walk away, you can walk away." Williamson objected, arguing the question essentially called for a "legal conclusion as to predisposition," but the court overruled the objection. The prosecutor then asked Verdugo: "Can you tell us, . . . the opportunity to walk away, is that something you all are taught to say in undercover training?" Verdugo responded:

> Yes. That's something we're trained to do. And the reason we do it is we try to get away from the entrapment issue, where we give them an opportunity to walk away and nothing would ever happen at that point. They would just simply walk away and we would not do anything with the case.

Williamson again objected and later moved for a mistrial, arguing the testimony amounted to a "legal conclusion" because it "left the

impression" that when officers advise people they can walk away "it's not entrapment." The court denied the motion.

¶29    A mistrial is one of the most dramatic remedies "and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Adamson*, 136 Ariz. 250, 262, 665 P.2d 972, 984 (1983). In deciding whether a mistrial is warranted, courts consider (1) whether the jury has heard something it should not hear, and (2) the probability that the jury was influenced by what it heard. *State v. Laird*, 186 Ariz. 203, 207, 920 P.2d 769, 773 (1996).

¶30    Williamson acknowledges that expert and lay witnesses may give opinion testimony, even though it embraces an ultimate issue of fact, when it is "'helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.'" *State v. Doerr*, 193 Ariz. 56, ¶ 26, 969 P.2d 1168, 1175 (1998), *quoting* Ariz. R. Evid. 701 (lay witness); *see also* Ariz. R. Evid. 702 (expert witness). But Williamson argues "neither lay witnesses nor expert witnesses can testify regarding a defendant's guilt or innocence." He maintains "Verdugo basically told the jury that [Williamson] was guilty because, if he gives them the opportunity to walk-away, it is not entrapment." Citing *Fuenning v. Superior Court*, 139 Ariz. 590, 605, 680 P.2d 121, 136 (1983), Williamson contends Verdugo's statement is analogous to an officer in a DUI prosecution testifying improperly that the defendant was impaired. We disagree.

¶31    Verdugo's testimony "embraced" Williamson's defense of entrapment because it related to the issues of inducement and predisposition. But his general testimony about why officers in undercover investigations are trained to give persons the opportunity to walk away did not mention Williamson, much less constitute an opinion on his "guilt or innocence or tell[] the jury how it should decide [his] case." *State v. King*, 180 Ariz. 268, 280, 883 P.2d 1024, 1036 (1994); *see, e.g.*, *State v. Chappell*, 225 Ariz. 229, ¶¶ 16, 18, 236 P.3d 1176, 1182-83 (2010) (testimony that drowning was "horrifying experience" and a "10" on "scale of 1 to 10" not improper opinion on ultimate issue whether crime committed in especially cruel manner); *Doerr*, 193 Ariz. 56, ¶¶ 25, 26, 969 P.2d at

1175 (testimony that police officer believed defendant untruthful during questioning on day of arrest did not constitute opinion on witness' credibility); *State v. Keener*, 110 Ariz. 462, 466, 520 P.2d 510, 514 (1974) (in possession for sale prosecution, officer's testimony drugs possessed for sale properly admitted). We thus find no error in the trial court's denial of the motion for a mistrial.

## Request for *Willits* Instruction

¶32 Williamson contends the trial court erred by refusing his request for a jury instruction pursuant to *State v. Willits*, 96 Ariz. 184, 191, 393 P.2d 274, 279 (1964). Williamson maintains he was entitled to the instruction concerning Angulo's deletion of text and voice messages Angulo had received from the informant prior to the officers' initial contact with Williamson. We review the court's ruling for an abuse of discretion. *See State v. Glissendorf*, 235 Ariz. 147, ¶ 7, 329 P.3d 1049, 1052 (2014).

¶33 "[I]f the state fails to preserve evidence that is potentially exonerating, the accused might be entitled to an instruction informing the jury that it may draw an adverse inference from the state's action." *Id.* ¶ 1, *citing Willits*, 96 Ariz. at 191, 393 P.2d at 279. "To be entitled to a *Willits* instruction, a defendant must prove that (1) the state failed to preserve material and reasonably accessible evidence that could have had a tendency to exonerate the accused, and (2) there was resulting prejudice." *State v. Smith*, 158 Ariz. 222, 227, 762 P.2d 509, 514 (1988).

¶34 Relying on Rule 15.4(b)(2), Ariz. R. Crim. P., the state argues it "was under no obligation to preserve the messages between Angulo and the confidential informant." That subsection provides that the state is not required to disclose the existence or the identity of a non-testifying informant "where disclosure would result in substantial risk to the informant or to the informant's operational effectiveness, provided the failure to disclose will not infringe the constitutional rights of the accused." Thus, under Rule 15.4(b)(2), the state may refuse a defendant's request to turn over information about the existence or identity of an informant, but the ultimate decision whether the state must disclose such

information rests with the trial court. And although the rule addresses the state's duty to disclose, it neither addresses nor excuses the state's failure to preserve evidence that meets the "tendency to exonerate" standard when the court subsequently orders disclosure of an informant's existence or identity. In short, although the state's failure to preserve the messages may have been innocent, it was not excused by the rule.[2]

**¶35**        In *Glissendorf*, our supreme court stated that giving a *Willits* instruction as "[a] consequence for even innocent loss or destruction is necessary both to deter such action and to ensure that defendants do not bear the burden of the state's actions." 235 Ariz. 147, ¶ 13, 329 P.3d at 1053. The court pointed out that "the *Willits* instruction takes into account the state's explanation of the destruction by permitting jurors to draw an adverse inference only if they 'find that any such explanation is inadequate.'" *Id.*, *quoting* State Bar of Arizona, *Revised Arizona Jury Instructions (Criminal)* Std. 10 (2013). In this case, both the existence and the identity of the informant were disclosed. Thus, the jury could have found the state's explanation for deleting the text and audio messages inadequate. We therefore address whether Williamson demonstrated the destroyed evidence had a tendency to exonerate him.

**¶36**        "To show that evidence had a 'tendency to exonerate,' the defendant must do more than simply speculate about how the evidence might have been helpful." *Id.* ¶ 9. The defendant must

---

[2] In *Glissendorf*, the court stated "[t]he 'failure to preserve potentially useful' evidence is not a denial of due process unless 'a criminal defendant can show bad faith on the part of the police.'" 235 Ariz. 147, ¶ 11, 329 P.3d at 1052-53, *quoting Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Thus, "[t]he 'tendency to exonerate' test is not the same as that for a violation of due process." *Id.* "[T]he test for a violation of due process depends on the subjective intent of law enforcement, while the test for giving a *Willits* instruction is explicitly intended to cover innocent destruction." *Id.*

"'demonstrate that the lost evidence would have been material and potentially useful to a defense theory supported by the evidence.'" *Id.* ¶ 10, *quoting State v. Glissendorf*, 233 Ariz. 222, ¶ 17, 311 P.3d 244, 251 (App. 2013).

¶37 Williamson argues the messages were "material for effective cross-examination of both [the informant] and Angulo" to resolve the discrepancies between their testimony about "what [the informant] told Angulo about the defendants," "what promises were made [by the officers] to [the informant]," whether the informant approached Williamson and the others about "a home invasion or a drug deal," and "whether there was an existing home invasion crew in place."

¶38 First, although Angulo admitted deleting the text and voice messages, there was no evidence suggesting any of the alleged discrepancies were evident in those messages. Thus, it is speculative whether the messages would have been helpful to Williamson's defense. *See id.* ¶ 9. Second, Williamson recognizes, given his entrapment defense, that "the primary issue for the jury to decide was [his] predisposition to commit the crime[s]." But, none of the alleged discrepancies amounts to evidence that "the state induce[d] an otherwise innocent person to commit a criminal act" through Angulo's actions or the informant's. *State v. Rocha-Rocha*, 188 Ariz. 292, 295, 935 P.2d 870, 873 (App. 1996).

¶39 Neither the informant's alleged description of the offense as a "drug deal," nor his alleged assertion that a home invasion crew was not already in place, established that Williamson was not predisposed to commit the offenses. *See* A.R.S. § 13-206(B)(3) (to support defense of entrapment, defendant must prove he was "not predisposed to commit the type of offense charged"). During his initial meeting with the officers, Williamson readily agreed to the plan and told the officers he had committed home invasions in the past. We also fail to see how Williamson was induced to commit the offenses by the informant's alleged description of the plan as a "drug deal," by the information about the defendants given to the officers by the informant, or by the promises the officers made to the informant in exchange for that

information. Indeed, there is no evidence the informant "urged and induced [Williamson] to commit the offense[s]." § 13-206(B)(3). The informant left the initial meeting between the officers and Chris Williamson after making introductions, so he did not participate in any discussions about the home invasion. And in any event, Williamson did not attend that initial meeting, and the informant was not present during any of the subsequent meetings Williamson did attend. Finally, there was no evidence that the informant and Williamson had any communications outside of those meetings. The trial court did not err in refusing the request for a *Willits* instruction.

## Motions for Judgment of Acquittal and New Trial

**¶40**      Williamson argues the trial court erred in denying his motion for a judgment of acquittal made under Rule 20, Ariz. R. Crim. P., and his subsequent motion for a new trial, claiming "[t]he evidence presented was insufficient to support the jury's verdict . . . because he proved his entrapment defense by clear and convincing evidence." We review de novo the court's denial of the Rule 20 motion, *State v. Tucker*, 231 Ariz. 125, ¶ 27, 290 P.3d 1248, 1261 (App. 2012), and we review the court's ruling on the motion for a new trial for an abuse of discretion, *State v. Davis*, 226 Ariz. 97, ¶ 5, 244 P.3d 101, 103 (App. 2010). We will reverse a conviction "'only if there is a complete absence of substantial evidence to support the'" jury's verdict. *State v. Ramsey*, 211 Ariz. 529, ¶ 40, 124 P.3d 756, 769 (App. 2005), *quoting State v. Sullivan*, 187 Ariz. 599, 603, 931 P.2d 1109, 1113 (App. 1996). "Substantial evidence" is proof that reasonable people could accept as sufficient to support a conclusion of guilt beyond a reasonable doubt. *State v. West*, 226 Ariz. 559, ¶ 16, 250 P.3d 1188, 1191 (2011).

**¶41**      "It is an affirmative defense to a criminal charge that the person was entrapped." § 13-206(A). The entrapment defense "is based on the public policy notion that legislatures 'could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense but was induced to commit them by the Government.'" *State v. Preston*, 197 Ariz. 461, ¶ 5, 4 P.3d 1004, 1007 (App. 2000), *quoting United States v. Russell*, 411 U.S. 423,

435 (1973). Thus, "[e]ntrapment does not exist where law enforcement officers have merely afforded an opportunity for a predisposed person to commit a crime." *State v. Gessler*, 142 Ariz. 379, 382, 690 P.2d 98, 101 (App. 1984).

¶42 Like other affirmative defenses, the defense of entrapment "is a matter of avoidance of culpability even if the State proves the offense beyond a reasonable doubt." *State v. Farley*, 199 Ariz. 542, ¶ 11, 19 P.3d 1258, 1260 (App. 2001). Therefore, to assert an entrapment defense, a defendant must admit the substantial elements of the charged offense, § 13-206(A), and must prove each of the following by clear and convincing evidence: (1) the idea of committing the offense originated with law enforcement officers or their agents and not with the defendant; (2) officers or their agents "urged and induced" the defendant to commit the offense; and, (3) the defendant "was not predisposed to commit the type of offense charged" before being urged and induced by the officers or their agents to commit it, § 13-206(B).

¶43 The state concedes the idea for the home invasion originated entirely with the officers. But the state argues Williamson failed to establish that the officers "acted to induce an 'otherwise innocent person' to commit the offenses" or that he was not predisposed to commit the crimes.

¶44 Williamson maintains the evidence "established that the officers lacked any knowledge of [his] alleged 'criminal background or propensity' prior to the officers inventing the stash-house scheme," they did not suspect him of "being associated with home invasions," and the officers supplied "guns and ballistic vests." Williamson's argument appears to focus primarily on what the officers knew about his criminal history and their conduct in planning and supplying weapons for the home invasion.

¶45 In *State v. Kiser*, 26 Ariz. App. 106, 110-11, 546 P.2d 831, 835-36 (1976), we noted "the question of whether a defendant was induced to commit a crime against his natural inclinations must be answered in part by examining what the officers actually did in the particular case." But we also stated "entrapment [is not] proved as a

matter of law solely by reference to the objective character of police conduct." *Id.* at 110, 546 P.2d at 835. "The guilt or innocence of a criminal defendant should instead depend as far as possible on his own conduct and intent." *Id.* Here, there was ample evidence for the jury to conclude that Williamson was not induced to commit the charged offenses and, even if he was, that he was predisposed to commit them. *See* § 13-206(B).

**¶46** Angulo testified the informant told him he knew someone, referring to Chris Williamson, who was willing to commit a home invasion. Although, as Williamson points out, the informant denied saying this, the jury heard the informant's deposition testimony and Angulo's trial testimony, and it was the jury's role to weigh the evidence and resolve issues of credibility. *See State v. Parker*, 231 Ariz. 391, ¶ 73, 296 P.3d 54, 71 (2013). As to the issue of predisposition, the evidence established Williamson told the officers he previously had committed home invasions. The evidence further established that when the officers told Williamson and the others they could walk away, "all of them [stated] that they[ we]re in." And although the officers supplied the guns, they did so at Williamson's request. He also told the officers he had a shotgun and a cattle prod he intended to use. And, as we noted above, contrary to Williamson's argument, the officers did not supply all of the materials to commit the offenses. When Williamson and the others were arrested, they had in their possession pepper spray, knives, masks, rubber gloves, and plastic zip ties to be used for restraints.

**¶47** Whether we review the trial court's rulings for abuse of discretion, *Davis*, 226 Ariz. 97, ¶ 5, 244 P.3d at 103 (new trial), or de novo, *Tucker*, 231 Ariz. 125, ¶ 27, 290 P.3d at 1261 (Rule 20 motion), we find no error in the court's denial of the Rule 20 motion and motion for a new trial.

### Stipulation to Elements of Offenses

**¶48** Williamson last contends the trial court erred in finding he was required to "enter into a stipulation admitting all of the elements of the offense[s]" to be entitled to a jury instruction on the defense of entrapment. We review a court's decisions on the

admission or exclusion of evidence for an abuse of discretion. *State v. Hensley*, 142 Ariz. 598, 602, 691 P.2d 689, 693 (App. 1984).

¶49 Williamson acknowledges that under § 13-206(A), a person claiming entrapment "must admit by the person's testimony or other evidence the substantial elements of the offense charged." But he maintains that because the statute requires only that a defendant admit the elements by "testimony or other evidence," the trial court erred in requiring him to enter into a stipulation.

¶50 A stipulation constitutes "other evidence" under the statute. Stipulations are agreements, admissions, or concessions made by the parties in judicial proceedings concerning incidental matters "'for the purpose, ordinarily, of avoiding delay, trouble and expense.'" *State v. Virgo*, 190 Ariz. 349, 353, 947 P.2d 923, 927 (App. 1997), *quoting Harsh Bldg. Co. v. Bialac*, 22 Ariz. App. 591, 593, 529 P.2d 1185, 1187 (1975). In criminal proceedings, stipulations do not relieve the state of its burden of proving each element of an offense beyond a reasonable doubt. *State v. Carreon*, 210 Ariz. 54, ¶¶ 46-47, 107 P.3d 900, 910 (2005). Thus, stipulations are afforded no greater weight or believability than any other evidence admitted at trial. "Although stipulations may bind the parties and relieve them of the burden of establishing the stipulated facts, stipulations do not bind the jury, and jurors may accept or reject them." *State v. Allen*, 223 Ariz. 125, ¶ 11, 220 P.3d 245, 247 (2009). Here, nothing in the record suggests the trial court instructed the jury, either through the stipulation or otherwise, that the state was relieved of its burden of proving each element of the offenses. *See State v. Preston*, 197 Ariz. 461, ¶ 12, 4 P.3d 1004, 1009 (App. 2000).

¶51 In *State v. Nilsen*, 134 Ariz. 431, 657 P.2d 419 (1983), our supreme court discussed the various methods by which a defendant can admit the elements of an offense when asserting an entrapment defense. The court stated a defendant "need not take the stand in order to assert the defense of entrapment." *Id.* at 432, 657 P.2d at 420. However, the "admission must be made in some affirmative manner and cannot be assumed from a defendant's silence." *Id.* Contrary to Williamson's argument, the court stated that a defendant may "stipulate to the admission" or "have his admission

of the elements read into evidence." *Id.*, *citing State v. Mendoza*, 109 Ariz. 445, 447, 511 P.2d 627, 629 (1973). We conclude the court did not abuse its discretion in requiring Williamson to admit the elements of the offenses by stipulation.

## Disposition

¶**52**      For all of the foregoing reasons, we affirm Williamson's convictions and sentences.